Pedro Juan SOTO, et al., Plaintiffs,

v.

Carlos ROMERO BARCELÓ, et al., Defendants.

Civ. Nos. 79–236(PG), 82–350(PG).

United States District Court,
D. Puerto Rico.

March 15, 1983.

José Carreras, Pedro J. Varela, Hato Rey, P.R., Michael Avery, Boston, Mass., José A. Lugo, Michael Ratner, Center for Constitutional Rights, New York City, Peter Berkowitz, Rina Biaggi-Garcia, Luquillo, P.R., Roberto Armstrong, Jr., Dept. of Justice, San Juan, P.R., for plaintiffs.

Richard L. Cys and Mary Ann Clifford, Verner, Liipfert, Bernhard & McPherson, Washington, D.C., for defendants C. Romero Barcelo and Pedro Rivera Casiano.

Pedro A. Otero Fernández, Rio Piedras, and Hato Rey, P.R., for defendants Julio Cesar Andrades Cepeda and Julio Cesar Andrades.

Alex González, Dubón, González & Berrios, San Juan, P.R., for Roberto Torres González, Rafael Torres, Alejandro González Malavé and Desiderio Cartagena.

Hector Laffitte, Laffitte & Dominguez, Hato Rey, P.R., for Julio Andrades, Luis Reverón Martinez and José Rios Polanco.

A. Santiago Villalonga, San Juan, P.R., for Alejandro González Malavé.

Francis, Doval, Munõz, Acevedo, Otero & Trias, Arturo Trias, San Juan, P.R., for San Juan Star Co. and Overseas Press Club.

Rivera Cestero and Marchand Quintero, Juan R. Marchand Quintero, San Juan, P.R., for El Mundo, Inc.

Arturo Nieves Huertas, Bayamon, P.R., for La Asociacion de Periodistas de P.R.

José A. Nazario and Carlos A. Ortiz Morales, San Juan, P.R., for Miguel Hernández Agosto, Pres. of Senate.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

This case is before the Court on the Motion of Governor Carlos Romero Barceló, as a prevailing party, for an order awarding the amount of reasonable attorney's fees expended in his behalf.

The Complaint in this case, founded primarily upon 42 U.S.C. 1983 and 1985(3), was brought by the survivors of Carlos Soto Arriví and Arnaldo Darío Rosado against the Governor and several other defendants. The Complaint alleges (1) that the Governor, through his acts or omissions, was directly responsible for the deaths of Rosado and Soto; (2) that he participated in a conspiracy with the police to ambush and kill these two men, for his own political purposes; and (3) that he and other defendants were responsible for the deaths of Soto and Rosado because of their failure to properly train and supervise the police officers involved in the incident at Cerro Maravilla.

On July 22, 1982, after three and a half years of litigation, this Court granted the Governor's Motion for Summary Judgment and as a result, he now moves for an award of the attorney's fees expended in his behalf.

Having reviewed the entire record in this matter, and having presided over the case almost since its inception, this Court in its discretion finds that the reasonable attorney's fees expended on behalf of Carlos Romero Barceló should be awarded.

### I. Summary of the Proceedings

The Complaint in this case, first filed in January of 1979 and subsequently amended in May of 1979, alleged that the Governor directly, and through his participation in a conspiracy with the police, caused the deaths of Soto and Rosado at Cerro Maravilla on July 25, 1978. The charges in the Complaint were extensive and detailed; they were not qualified by any language indicating that they were based upon "information and belief" or otherwise were facts established with less than certainty. Read in its entirety, the Complaint accused Romero Barceló of committing murder.

In July of 1979, the Governor instituted discovery to learn whatever facts plaintiffs could show in support of the serious allegations they had made against him. Plaintiffs' responses to these requests did not candidly state, as their counsel did at oral argument on this motion, that the basis of the Complaint was predicated upon suspicions drawn principally from the Puerto Rican media. Throughout discovery, in responding to Romero Barceló's discovery requests, plaintiffs restated and embellished the allegations in their Complaint without specific support or proper citation to material facts and proposed supporting testimony. Often they repeated allegations which undisputed record evidence had disproved.[1]

1. After Magistrate Dennis Simonpietri Monefeldt issued an Order in July of 1980 compelling more complete discovery responses, plaintiffs did not respond in compliance with the requirements of the Order of the Federal Rules. Instead of setting forth facts with appropriate citations in support of their claims, they repeated virtually the same factual version which was not supported by the record. See Appendix attached hereto for a chronological summary of the discovery record in this case. For example, in October of 1980 they claimed that

Pedro Rivera Casiano had participated in a conspiracy with the Governor between July 10 and July 24, 1978, when the undisputed facts of record, known to plaintiffs for over one year, demonstrated that he was in Scotland playing golf during the time he was allegedly conspiring in Puerto Rico. (Rivera Casiano was voluntarily dismissed from the case by stipulation in July of 1981.) They also claimed that at a meeting on July 21, 1978, Romero Barceló received detailed information about the planned

An important milestone in this case was the deposition of the Governor on June 11, 1980, at which this Court presided. The substance of that proceeding developed facts which not only failed to support plaintiffs' claims, but also contradicted their main allegations and their content.

Based on all of the materials of record after the deposition,[2] the undisputed facts demonstrated that the Governor had played no role in any murder or conspiracy in the Cerro Maravilla matter. The facts showed that he had no specific advance knowledge either of the planned attack on communications towers in the Toro Negro area by Soto and Rosado or of the plans of the Police Department to respond to these activities. As a result of a meeting with then Police Superintendent Roberto Torres González on July 21, 1978, the Governor had only general knowledge of the proposed terrorist activity in the Toro Negro area on July 25, and he had no further communication about the matter before the shootout occurred at Cerro Maravilla on July 25. After the deposition of the Governor, although plaintiffs continued the litigation for two more years, they did not amend their Complaint or take any other affirmative action to tailor their allegations to the state of the evidence on record.

In April of 1982, plaintiffs responded to Romero Barceló's summary judgment motion filed in mid 1981 after the close of discovery. While conceding that they must either prove that Romero Barceló conspired to ambush and murder Soto and Rosado or lose their case, they produced no material facts to support their claims. It was apparent that the state of their record evidence had not changed at least since the deposition of the Governor almost two years earlier. As this Court observed in granting Romero Barceló's summary judgment motion, plaintiffs' recital of alleged material facts in issue was speculative, unsupported and self-serving.

Finally, the Court observes that creating publicity and obtaining political advantage have been part of plaintiffs' motivation in bringing this case. The Court makes this finding based upon the approach taken by plaintiffs' counsel from the outset and the Court's observations of these proceedings. For example, during the early stages of the case, plaintiffs' counsel sought to depose the Governor on July 24, 1979, at the Puerto Rico Bar Association, at a time obviously calculated to create maximum publicity since it was immediately before the first anniversary of the shootout at which Soto and Rosado were killed. In addition, their counsel have frequently publicized information obtained through discovery in these proceedings and have apparently been in frequent contact with reporters. At the same time, they refused to agree to a protective order which would have given them access to discovery materials in August 1979; and they have unsuccessfully challenged routine protective orders and restrictions on the dissemination of information obtained during discovery.[3] Lastly, plaintiffs' motivation in bringing this suit against the Governor was patently manifested when they failed to appeal this Court's Final Judgment granting the Motion for Summary Judgment and dismissing the Complaint against the Governor on November 17, 1982.

attack when the record showed that he had not.

2. Those materials included depositions of the only persons whom plaintiffs could claim were principal witnesses against the Governor—Police Superintendent Desiderio Cartagena and former Superintendent Roberto Torres González.

3. See, e.g., In re San Juan Star Co., 662 F.2d 108 (1 Cir., 1981). With one exception not applicable here, they have not been accused of violating outstanding protective orders regarding dissemination of information obtained during discovery. Moreover, the Court does not express any opinion about the propriety of their conduct; this finding is made in order to understand fully how and why this case developed as it did.

## II. Discussion

### A. Principles of Law

Pursuant to the applicable civil rights statutes,[4] a court may in its discretion award reasonable attorney's fees to a prevailing party. While prevailing plaintiffs are generally awarded their attorney's fees as a matter of course, the guidelines for determining whether to award attorney's fees to prevailing defendants are governed by the Supreme Court's recent pronouncements in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).[5]

Under *Christiansburg* a court may award attorney's fees to a prevailing defendant "upon a finding that the plaintiffs' action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.*, at 421, 98 S.Ct. at 700. In addition, under *Christiansburg*, a prevailing defendant is entitled to his attorney's fees upon a finding that "the plaintiff continued to litigate after [his claim] clearly [became] frivolous, unreasonable, or without foundation." *Id.*, at 422, 98 S.Ct., at 700. Finally, where plaintiffs bring or continue this sort of claim in bad faith, "an even stronger basis" exists for assessing attorney's fees. *Id.*, at 422, 98 S.Ct., at 700.

The Supreme Court in *Christiansburg* also cautioned that it is inappropriate to apply "hindsight logic" to conclude that "because the plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Id.*, at 421, 98 S.Ct., at 700. The inquiry, therefore, must go beyond the end result and a retrospective view of how the litigation unfolded. This Court must view the situation as it appeared when the case moved through its various stages and determine whether there existed "material, admissible evidence" to support the plaintiffs' claim.[6]

■ The Court is also mindful that attorney's fees should not routinely be awarded to prevailing defendants in civil rights cases. Given the purposes of the civil rights laws, the Supreme Court in *Christiansburg* has carefully limited the circumstances in which an award of fees to a prevailing defendant is proper. It is not enough that plaintiffs have lost their case. Nevertheless, civil rights plaintiffs do not enjoy unfettered incentives to litigate against government officials. *Id.*, at 419, 98 S.Ct., at 699. And the Court has recently emphasized that insubstantial cases against public officials should be dismissed without trial. *Harlow v. Fitzgerald*, —— U.S. ——, ——, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). Nor can the harm of insubstantial cases be ignored:

> "(I)t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to the society as a whole. These social costs include the expenses of litigation, the di-

---

**4.** 42 U.S.C. 1988, as amended by the Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559, 90 Stat. 2641.

**5.** See also *Hughes v. Rowe*, 449 U.S. 5, 15, 101 S.Ct. 173, 179, 66 L.Ed.2d 163 (1980). Although the Supreme Court in *Christiansburg* interpreted section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–5(k) (Supp.IV 1980), and not section 1988, the language of section 706(k) is essentially identical to that of section 1988. Indeed, the Court subsequently recognized this fact in *Hughes v. Rowe, supra*, at 14, 101 S.Ct. at 178, a per curiam decision holding that the Court's pronouncements in *Christiansburg* applied fully to section 1988. See also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 755, 100 S.Ct. 2455, 2458, 65 L.Ed.2d 488 (1980). The United States Court of Appeals for the First Circuit reiterated the Supreme Court's per curiam holding in *Christiansburg* in *Nadeau v. Helgemore*, 581 F.2d 275, 281 (1 Cir., 1978). See also *Prochaska v. Marcoux*, 632 F.2d 848 (10 Cir., 1980); *Hughes v. Repko*, 578 F.2d 483, 489 (3 Cir., 1978).

**6.** *Church of Scientology v. Cazares*, 638 F.2d 1272, 1290 (5 Cir., 1981) (mayor entitled to his attorney's fees). See also *Tonti v. Petropoulos*, 656 F.2d 212, 217 (6 Cir., 1981) (probate judge entitled to attorney's fees); *Woods v. State of New York*, 494 F.Supp. 201, 203–4 (S.D.N.Y., 1980) (various officials of the State of New York entitled to attorney's fees); *Eagle v. Kenai Peninsula Borough*, 489 F.Supp. 138, 140 (D.Alaska, 1980) (various borough officials entitled to attorney's fees). See *Whiten v. Ryder Truck Lines, Inc.*, 520 F.Supp. 1174, 1176–77 (N.D.La., 1981) (frivolous Title VII case).

version of official energy from pressing public issues, and deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute and the most irresponsible [public officials] in the unflinching discharge of their duties."

*Id,* at ——, 102 S.Ct. at 2736 (citations and footnotes omitted).[7] While insubstantial cases are not necessarily frivolous, unreasonable or without foundation, the guideposts of *Harlow* suggest additional reasons why plaintiffs should be held accountable for litigating cases that are frivolous, unreasonable or without foundation.

■ Next, just as a plaintiff may be said to have prevailed without ever obtaining any final relief,[8] so may a defendant prevail before judgment in the sense that the case against him is demonstrably groundless. Once that occurs, plaintiffs must halt the litigation, or under *Christiansburg,* incur an award against them of defendants' reasonable attorney's fees. This construction gives meaning to the Court's statement in *Christiansburg* that attorney's fees should be awarded when plaintiffs continue the litigation after it becomes frivolous, unreasonable or without foundation.[9]

■ Further guidance about implementing the standard of *Christiansburg* is sparse. In general, the courts addressing this issue have. held that attorney's fees should be awarded to prevailing defendants where their opponents cannot produce credible evidence in opposition to summary judgment motions or at trial on the merits.[10] Where a plaintiff proceeds on the strength of allegations, which are unsupported and indeed contradicted by unrebutted deposition testimony, attorney's fees should be awarded to a defendant who obtains summary judgment in his favor.[11] The same is true of meritless allegations of a conspiracy.[12]

### B.  Analysis of This Case

■ Applying these concepts here requires analyzing the various stages of the litigation from an objective prospective at the time. The case began in the Spring of 1979 with a detailed complaint alleging that the Governor of Puerto Rico participated in a conspiracy to murder two men of different political persuasion than he and, in addition, that he directly caused their deaths. These were grave allegations made in detail and without qualification. Yet, from the

---

7.  These views dovetail with the Court's expression in *Christiansburg* that Congress intended an award of attorney's fees to deter the bringing of lawsuits without foundation. 434 U.S., at 423, 98 S.Ct. at 701. While the statute involved in *Christiansburg* is different from that involved here, the same reasoning applies to the virtually identical language of the fees provision at issue here. See note 5 above.

8.  *Coalition for Basic Human Needs v. King,* 691 F.2d 597 (1 Cir., 1982). See also *Burke v. Guiney,* 700 F.2d 767 (1 Cir., 1983).

9.  In *Olitsky v. O'Malley,* 597 F.2d 303 (1 Cir., 1979) the Court found that the failure of plaintiffs to dismiss voluntarily after defendants had filed a trial brief highlighting the weakness of the asserted claim did not prove bad faith or harassment. *Id.,* at 305–306. This holding is not inconsistent with views expressed above. The claims in *Olitsky* were essentially legal ones apparently based upon uncontested facts. In addition, the Court was addressing the question of bad faith and not the lesser standard of *Christiansburg*—whether the case was frivolous, unreasonable or without foundation.

10.  *Prochaska v. Marcoux,* 632 F.2d 848, 851 (10 Cir., 1980) (court of appeals reversed district court's denial of attorney's fees because plaintiff's testimony in opposing summary judgment motion did not reinforce allegations. that police officers had acted unlawfully); *Koon v. Metts,* 472 F.Supp. 897, 899 (D.S.C., 1978) (district court awarded attorney's fees to defendant because of lack of credible evidence proffered by plaintiff, as indicated by fact that verdict for defendant was reached in less than forty-five minutes); *Keown v. Storti,* 456 F.Supp. 232, 244 (E.D.Pa., 1978), aff'd. 601 F.2d 575 (3 Cir., 1979) (district court awarded attorney's fees to defendants after trial on the merits uncovered no evidence of knowing involvement in conspiracy and, "if this was not clear at the start of the case; it at least should have been after discovery").

11.  *Prochaska v. Marcoux, supra,* note 10, at 854.

12.  *Keown v. Storti, supra,* note 10, at 244.

record and remarks of plaintiffs' counsel at the hearing on this matter, it appears that the principal basis for the Complaint was drawn from newspaper stories and media statements. To be sure, at the time, the local press was actively interested in the Cerro Maravilla incident. Some articles had appeared mentioning the Governor; accusations were leveled at him by political opponents and others; and in May of 1979 he appeared on television and radio to explain that he had nothing to do with any wrongdoing in connection with the events at Cerro Maravilla in July of 1978.

Plaintiffs say that reliance on these and other media statements shields them from an award of attorney's fees. This argument misses the mark. Whether plaintiffs proceeded in good faith because they brought their Complaint in reliance upon statements in the media is not the issue. As the Supreme Court in *Christiansburg* emphasized, the test is not whether plaintiffs proceeded in subjective bad faith. 434 U.S., at 412, 98 S.Ct. at 694. See *Burke v. Guiney,* 700 F.2d 767, 772 (1 Cir., 1983). Plaintiffs' reliance on news articles and reports in the press relates to the issue of bad faith rather than to the relevant question of whether admissible evidence existed to support their claims. The pertinent inquiry is whether Romero Barceló had to defend against claims that did not have any factual support and the answer is determined by whether there was any admissible evidence to support their claims when they filed their Complaint and thereafter.

Based on a review of record and the facts existing at the time, the Court finds that this case was frivolous, unreasonable, or without foundation at its inception. The exemplars of newspaper articles which plaintiffs have filed with the Court as their basis for proceeding are not themselves admissible evidence and none contain statements of admissible facts to prove their claims against the Governor. Their "suspicions" about the Governor's involvement and his credibility were guesswork and nothing more. These findings also appear from plaintiffs' discovery answers which show that they constructed a version of facts based on speculation, rumor and innuendo in the media.

As the case unfolded, the absence of support for plaintiffs' allegations against the Governor became all the more apparent. The various discovery responses of plaintiffs implied the absence of admissible facts while still asserting an account of the events that involved the Governor in a murder plot. Then, after the deposition of the Governor in June of 1980, all of the uncontroverted facts of record demonstrated that plaintiffs' case was frivolous, unreasonable or groundless. Any reasonable observer would have concluded that the Governor had not committed the acts alleged by plaintiffs. Plaintiffs simply had no evidence in support of their claims that the Governor was a murderer and conspirator, and the record showed as much. When they continued litigating after that time, they did so at risk that attorney's fees would be awarded against them.

Plaintiffs once again argue that they continued their case because of media developments in September of 1980, three months after the deposition and in the heat of the always emotional political campaigns in Puerto Rico. Apart from the questionable relevance of these belated developments, this argument relates only to the existence of good faith, which, as stated above, is not in issue. Moreover, the Court finds that the nature of the statements made by the two individuals in question could not reasonably be relied upon for factual support for plaintiffs' Complaint in light of the other record evidence.[13]

Media reports of rumors, gossip and speculation appear frequently in Puerto Rico's

---

13. These individuals, Julio C. Andrades and Angel David González, did not make any factual claims against the Governor in the media reports cited by plaintiffs, and the timing and substance of their statements cast serious doubts on their credibility. Depositions of them taken in October and November of 1980 did not, as plaintiffs acknowledge, reveal any facts concerning the Governor. It is significant that plaintiffs maintained their case even after these depositions when no press reports could have justified their continuing.

media, especially during elections every four years. If plaintiffs waited long enough, it is likely that additional rumors and speculation about Cerro Maravilla would appear in the press and they then would claim they have a right to pursue their case without risking an award of attorney's fees against them. That is not the law. Especially in the unique circumstances of Puerto Rico, the Court finds that, without more, reliance on the statements in the media which plaintiffs cite does not avoid an award of attorney's fees under *Christiansburg.*

To complete the picture of this litigation, the Court finds that the plaintiffs had motives for bringing this lawsuit unrelated to obtaining a judgment in their favor. These motives included creating publicity and, in some measure, pursuing the political philosophy of those opposed to the political beliefs of Romero Barceló. These motivations are apparent from the conduct of the litigation in general, the actions of plaintiffs' attorneys in seeking to create publicity and litigating about protective orders in this Court, and upon a review of the nature of plaintiffs' discovery responses when compared to the state of the record evidence at the time they made them. It must follow that reliance on press reports was not the only reason that plaintiffs proceeded with their case against the Governor for over three years.

This view of the case puts into context the course of these proceedings from the beginning. Plaintiffs made the choice of alleging that the Governor directly and through a conspiracy murdered two men for political reasons. They pursued these allegations zealously despite the absence of evidentiary foundation and support for these claims. Having made this choice, they apparently prolonged the proceedings against him for as long as they could for the purposes of creating publicity and pursuing political goals. Any other alleged legitimate purpose is belied by their conformity with this Court's dismissal of the case against the Governor.

In the circumstances of this case, the Court finds the situation to be one of those unique and rare occasions when attorney's fees ought to be awarded to a defendant, the Governor, as the prevailing party.

For these reasons, it is

ORDERED that Carlos Romero Barceló is entitled to an award in his behalf of the reasonable attorney's fees expended in his defense; and it is

FURTHER ORDERED that within thirty (30) days of the date of this Opinion and Order Romero Barceló is directed to submit a statement of the fees expended on his behalf in the defense of this case; and it is

FURTHER ORDERED that a hearing to determine the amount of attorney's fees to be awarded shall be scheduled as soon as the Court's calendar permits.

IT IS SO ORDERED.

### APPENDIX

Chronology of Pertinent Litigation Developments

January 17, 1979 Original Complaint filed.

May 8, 1979 Amended Complaint filed.

July 2, 1979 Romero Barceló's Answer and Motion to Dismiss filed.

July 9, 1979 Romero Barceló's first interrogatories and document production request filed.

July 12, 1979 Plaintiffs note the Governor's deposition for July 24, 1979, at the Bar Association.

July 18, 1979 Protective Order issued vacating the notice of deposition of the Governor.

September 4, 1979 Romero Barceló's Response to plaintiffs' document production demand filed.

Pedro Rivera Casiano, then an aide and co-defendant, also responded and produced documentation showing that he was in Scotland playing golf from July 10 to July 24, 1978.

September 26, 1979 Plaintiffs' first answers to discovery filed.

October 19, 1979 Romero Barceló's Motion to Compel held in abeyance pending supplemental answers.

November 15, 1979 Plaintiffs submit their amended Answers to Romero Barceló's Interrogatories. Interrogatories 1 and 2 from the First Set of Interrogatories of Romero Barceló and Rivera Casiano asked the following questions:

1. Describe the factual basis for the allegation in paragraph 47 of the Complaint that "the agreements reached at the meeting between Quiles and González Malavé were then conveyed to defendant Rivera Casiano."

2. Describe the factual basis for the allegation in paragraph 48 of the Complaint that "the agreements reached at the meeting between Quiles and González Malavé were then conveyed to defendant Romero Barceló."

Plaintiff responded as follows:

1. As an ordinary practice within the police department and the government of Puerto Rico, information concerning the department's use of undercover agents and its knowledge about upcoming illegal activities, was conveyed to Governor Romero Barceló by Police Superintendent Roberto Torres González and/or the Assistant Superintendent Desiderio Cartagena. This information, at times, was conveyed directly by the afore-mentioned police officers to Gubernatorial Aide Pedro Rivera Casiano and at times, from the Governor to this aide. These communications took place both in person and by telephone. These communications include a meeting which took place at La Fortaleza on or about July 23, 1978, in which Rivera Casiano, Cartagena and Romero Barceló, among others, were present. From this pattern of regular communication concerning the department's use of undercover agents in general and the specific use of undercover agent Alejandro González Malavé and his activities within the Frente Armado Anti-Imperialista and the Movimiento Revolucionario Armado, there is an inference that the final arrangements, confirmed at the meeting between Quiles and González Malavé, were communicated to both the Governor, defendant Romero Barceló and the gubernatorial aide, Rivera Casiano. This inference is also confirmed by evidence of former governmental officials concerning practices of communications between the police department and high government officials.

2. Such persons include Carlos Romero Barceló (hereinafter "Romero"); Jaime Quiles (hereinafter "Quiles"); Pedro Rivera Casiano (hereinafter "Rivera Casiano"); Desiderio Cartagena (hereinafter "Cartagena"); Roberto Torres González (hereinafter "Torres González"); Alejandro González Malavé (hereinafter "González Malavé"); José Enrique Sánchez (hereinafter "Sánchez"); former Governor Rafael Hernández Colón (hereinafter "Hernández Colón"), currently unemployed and residing in Guaynabo; and former police superintendent Astol Calero Toledo. Until plaintiffs have had the benefit of further discovery, plaintiffs cannot assert the identity of all other persons who have knowledge of the facts alleged.

January 16, 1980 Opinion and Order issued allowing deposition of Governor to proceed under strict conditions to prevent unfair publicity.

April 11, 1980 Motion to Compel Discovery filed by Romero Barceló and Rivera Casiano.

June 11, 1980 Deposition of Governor Romero Barceló.

July 10, 1980 Opinion and Order issued granting Motion to Compel specifically requiring as follows:

\* \* \* \* \* \*

Plaintiffs are further directed to supplement their responses to each interrogatory propounded by defendants Romero Barceló and Rivera Casiano in their First and Second Set of Interrogatories to plaintiffs, to include the following information:

(A) The names and addresses of all witnesses or persons upon whom they rely in support of the allegations made in their Complaint;

(B) A summary of the testimony or statements of all witnesses or persons who have knowledge relating to the allegations made in the Complaint;

(C) Identification and description of each document relied upon by plaintiffs in support of the allegations made in the Complaint.

Where witnesses have been deposed or documents have been furnished in discovery, only the person deposed or the document turned over need be identified.

3. To the extent that plaintiffs have no additional information or documentation responsive to any part of the First and Second Set of Interrogatories or First and Second Request for Production of Documents of defendants Romero Barceló and Rivera Casiano plaintiffs are hereby ORDERED to so state under oath. In addition, plaintiffs are directed to set forth in detail the efforts made to provide any supplemental information and documentation required by this Order that is unavailable for any reason.

October 8, 1980 Plaintiffs' Supplementary Answers to the First Set of Interrogatories to the Plaintiffs from the Defendants Romero Barceló and Rivera Casiano. The supplemental responses to Interrogatories 1 and 2 are as follows:

*Interrogatory No. 1*

1. Describe the factual basis for the allegation in paragraph 47 of the Complaint that "the agreements reached at the meeting between Quiles and González Malavé were then conveyed to defendant Rivera Casiano."

*Answer No. 1*

1. It is the ordinary practice within the government of Puerto Rico, especially during the time directly preceding the annual celebrations and demonstrations of July 25, for the Superintendent of Police to keep the Governor and his appropriate aides directly informed of suspected or anticipated terrorist activities. The Intelligence Office Commander, defendant Pérez Ca-

sillas, was kept posted on a daily basis by defendant González Malavé through defendant Quiles of the day to day plans and operations of the MRA. Defendant Pérez Casillas similarly kept Assistant Superintendent of Police Desiderio Cartagena and Superintendent of Police Torres González informed. Pérez Casillas was instructed at a meeting on July 21, 1978, to keep his superior closely informed of plans of the MRA to commit a terrorist act on July 25, 1978. Defendant Romero was given this information by Superintendent of Police Torres González on July 21, 1978. As aide to Romero, defendant Rivera Casiano was given this same information either by Romero or Torres González. There is a clear inference that defendants Romero and Rivera Casiano were kept fully informed of developments concerning these anticipated terrorist activities. Both Romero and Rivera Casiano were informed of the agreements reached at the meeting between Quiles and González Malavé referred to in paragraph 47 of the complaint. This inference is confirmed by evidence of former government officials concerning communication practices between the police department and high government officials.

2. Such persons include defendants Quiles, Pérez Casillas, Cartagena, Torres González, Rivera Casiano, Romero, Carmelo Cruz, González Malavé. Persons known to plaintiffs to have information concerning communication practices between the Police Department and government officials include former governor Hernández Colón and former Superintendent of Police Astol Calero Toledo. Former governor Hernández Colón resides in Guaynabo. Astol Calero resides at 7th Street, No. 3–5 Berwind Estates, Río Piedras, Puerto Rico. The addresses of the above named defendants are unknown to plaintiffs. Persons allegedly having information concerning defendants Romero and Rivera Casiano's prior knowledge include Angel David González, Asociación Miembros de la Policía, 566 Calle Alverio, Hato Rey,

José Enrique Arrarás, El Capitolio (anexo), San Juan, Puerto Rico.

3. & 4. Defendants are referred to the depositions of all the above named defendants and to the deposition of Astol Calero Toledo. Rivera Casiano, Angel David González, and José Enrique Arrarás have not as yet been deposed by plaintiffs, thus their anticipated testimony cannot be summarized by plaintiffs. Plaintiffs as yet have not interviewed former governor Hernández Colón nor do they have his written statement.

5. & 6. Plaintiffs are not in a position to list all documents which relate to the facts until further discovery is completed. Plaintiffs can identify the following documents upon which they may in part rely: Report of August 29, 1978, of the Commonwealth of Puerto Rico Department of Justice on the occurrences at Cerro Maravilla (hereinafter the "Justice Department Report"); transcripts of depositions above listed; Report of Enrique González and Ana Livia Cordero to the Bar Association of Puerto Rico concerning Cerro Maravilla; transcript of the testimony of Desiderio Cartagena during his senate confirmation hearings; the reports of defendant González Malavé to his supervisors, signed Fraile; various newspapers articles appearing in local newspapers concerning the above described incidents including but not limited to: El Nuevo Día, April 29, 1979, page 5; The San Juan Star, March 30, April 29 and 30, 1979, page 1; El Nuevo Día, April 30, 1979, page 3; The San Juan Star, September 11, 1980, page 1; El Nuevo Día, September 11 and 12, 1980, pages 3 and 2 respectively; El Mundo, September 16, 1980, Jorge Javariz column; El Nuevo Día, September 16, 1980, page 3; The San Juan Star, September 17, 1980, page 1; El Nuevo Día, September 17, 1980, pages 2 and 3.

7. Plaintiffs presently have no information responsive to this request.

8. Plaintiffs presently have no information responsive to this request.

*Interrogatory No. 2*

2. Describe the factual basis for the allegation in paragraph 48 of the Complaint that "the agreements reached at the meeting between Quiles and González Malavé were then conveyed to defendant Romero Barceló."

*Answer No. 2*

See answer to Interrogatory 1 above.

July 15, 1981 Summary Judgment Motion of Carlos Romero Barceló filed.

July 20, 1981 Stipulated dismissal of all claims against Pedro Rivera Casiano.

April 26, 1982 Plaintiffs' Opposition to Summary Judgment Motion filed.

July 22, 1982 Opinion and Order granting Summary Judgment and holding:

> Plaintiffs' opposition to the Governor's summary judgment is mostly conclusory allegations and a speculative, unsupported and self-serving analysis of the circumstances surrounding the events of the Cerro Maravilla (incident).

Opinion and Order at 6.

November 7, 1982 Final Judgment entered.