**Ruth COATES and Bennie Coates, Plaintiffs-Appellants,**

v.

**Tom BECHTEL, Defendant-Appellee.**

No. 86–1197.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1986.

Decided Feb. 2, 1987.

Diane L. Houk, Jacobson Sodos & Kringa, S.C., Milwaukee, Wis., for plaintiffs-appellants.

John Staks, Staks & Diel, Milwaukee, Wis., for defendant-appellee.

Before BAUER, Chief Judge, CUMMINGS and POSNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiffs appeal the district court's award of $4,000 in attorney's fees to the defendant pursuant to 42 U.S.C. § 1988. Because the district court abused its discretion in making the award, we reverse.

## I.

The litigation underlying the fee award arose out of the alleged discriminatory treatment which the plaintiffs received in their attempt to purchase the defendant's mobile trailer home. Because the merits of this litigation are critical to our determination that the fee award was unwarranted, the factual background must be reviewed at some length.

On April 21, 1985, the plaintiffs, husband and wife, responded to a newspaper advertisement regarding a mobile trailer home for sale at the "Little K Campsite" located in Eastman, Wisconsin. The campsite is owned and operated by William and Joan Guman. The Gumans lease campground lots and sites on a yearly basis to individuals who ordinarily place trailer homes on the lots. The defendant owns a trailer which is situated on a leased lot in the "Little K Campsite."

Upon their arrival at the campsite, the plaintiffs were met by the Gumans who informed them that the trailer mentioned in the advertisement had already been sold but that there were other trailers in the campground that might be available for purchase. The defendant had previously mentioned to the Gumans that he was considering selling his trailer, but had never advertised that it was for sale and had made no formal arrangement with the Gumans to act as his agents in selling the trailer. Nevertheless, the Gumans had a key to the defendant's trailer and were apparently authorized to show it to potential buyers. Upon viewing the trailer, the plaintiffs indicated that they were interested in purchasing it, and Mr. Guman offered

to telephone the defendant at his principal residence in Milwaukee. The defendant agreed to sell the trailer to the plaintiffs for $950 in cash. Because the plaintiffs wanted to occupy the trailer as soon as possible, the defendant instructed the plaintiffs to deliver the money to his father, Fritz Bechtel, who owned and operated a bar near the campsite and who would give them a receipt. After leaving the money with Fritz and making arrangements with him concerning keys and the disposition of the defendant's personal belongings which remained in the trailer, the plaintiffs returned to the campsite and began to fix and clean their newly purchased trailer.

By the time evening came, the plaintiffs had left the campsite after their $950 had been returned to them by the defendant's brother, Daniel Bechtel. What allegedly occurred during those intervening hours formed the basis for the plaintiffs' lawsuit. The defendant, his father, and his brother maintain that Mrs. Guman telephoned Fritz and told him that the plaintiffs had changed their minds and wanted their money back. Daniel delivered the money to the plaintiffs at the campsite and they subsequently left.

The plaintiffs' version of what transpired is, not surprisingly, quite different. They contend that a commotion arose at the campsite as a number of the other "Little K" residents complained about the fact that the defendant's trailer had been purchased by the plaintiffs because they were black. A heated argument ensued when criticism was directed at the Gumans for arranging the sale. Alarmed by this outburst, Mrs. Guman telephoned Fritz to find out why everyone was so angry with her husband. Fritz allegedly told her that the Gumans should have warned the defendant that the plaintiffs were black because he would never have agreed to sell the trailer to them if he had known. (Pl.App., Deposition of Joan Guman at 14). According to Mrs. Guman, Fritz referred to the plaintiffs as "niggers" throughout the conversation.

After this conversation, Mrs. Guman went over to the plaintiffs' trailer and ex-

plained to them what the commotion outside was all about. She relayed that Fritz Bechtel was unhappy about the plaintiffs' purchase of his son's trailer because of their race. She also told the plaintiffs that her husband was being harassed by the other campsite residents, who were threatening trouble if the plaintiffs did not leave. Mr. Coates suffered from a severe heart condition, and after listening to Mrs. Guman's story, he began to hyperventilate and experienced difficulty breathing. Fearing for her husband's health, Mrs. Coates decided that she and her husband could not remain at the "Little K" campsite as long as the other residents were so hostile. Mrs. Coates began to pack her car and planned to drive to Fritz's bar in hopes of getting her money back.

After leaving the plaintiffs, Mrs. Guman again called Fritz and told him that she thought that he could get the defendant's trailer back if he returned the plaintiffs' money to them at the campground. Fritz responded that he could not come, but that he would send his other son, Daniel. The plaintiffs maintain that Mrs. Guman acted on her own initiative in contacting Fritz and not at their request.

Just as the plaintiffs had finished packing their car and were preparing to leave, Daniel appeared beside the car and told them that Fritz had sent him to return the money they had paid for the trailer because he didn't want any "niggers" in the trailer. (Pl.App., Deposition of Ruth Coates at 68–69). Mrs. Coates took the money and gave Daniel a receipt stating that the Bechtels had changed their mind about the sale of the trailer because of "my race and color." As the plaintiffs attempted to leave the trailer camp, a group of camp residents gathered around their car and began to yell racial slurs and epithets. According to the plaintiffs, they were then chased all the way to LaCrosse, Wisconsin by three people in a red truck.

The plaintiffs proceeded to file this lawsuit, alleging numerous violations under the civil rights and fair housing laws, 42 U.S.C. §§ 1981, 1982, 3604, and the Wisconsin Open Housing Law, Wisc.Stat. § 101.-22. Named as defendants were Tom, Fritz, and Daniel Bechtel; Galen Phillips and Glenn Ramsette, both residents of the "Little K Campsite"; and unnamed John and Jane Doe defendants. In September 1985, Tom Bechtel moved for summary judgment on the grounds that (1) he could not be personally responsible for any of the alleged violations since he had had no contact with the plaintiffs on April 21st, other than the phone conversation in which he agreed to sell his trailer, and (2) he could not be vicariously liable for the alleged discriminatory acts of his agents, Fritz and Daniel Bechtel, because those acts exceeded the scope of their agency, which was limited to receiving the plaintiffs' purchase money. The district court granted summary judgment in favor of Tom Bechtel on October 30, 1985.[1] At the same time, however, the district court denied motions for summary judgment which had been contemporaneously filed by the other defendants, finding that there were "material factual issues in dispute about whether the defendants coerced, intimidated, or interfered with the plaintiffs' rights" under the fair housing and civil rights laws.[2]

After obtaining summary judgment, defendant Tom Bechtel filed a motion seeking attorney's fees from the plaintiffs as a

---

1. The district court held that Fritz was the defendant's agent for the limited purpose of receiving the plaintiffs' purchase money. Because "the plaintiffs could not have reasonably believed that Fritz Bechtel's actions after he accepted the purchase money and gave the receipt were within the scope of his apparent authority," the court concluded that Fritz's actions could not be imputed to the defendant. The district court also found that there was no express agency relationship between Daniel and the defendant and that no such relationship could be inferred from the agency relationship between Fritz and the defendant because Fritz was not acting within the scope of his apparent authority when he told Daniel to return the plaintiffs' money.

2. The record indicates that the plaintiffs' suit against these defendants went to trial and that a jury verdict was returned in favor of all the remaining defendants on November 13, 1985.

prevailing party in a civil rights action pursuant to 42 U.S.C. § 1988. The district court concluded that the plaintiffs' action against Tom Bechtel was unreasonable and without foundation and awarded him $4,059.50 in attorney's fees under § 1988. The plaintiffs appeal this award.

## II.

■ 42 U.S.C. § 1988 empowers the district court, in its discretion, to award the "prevailing party" in a civil rights action a reasonable attorney's fee as part of the costs. As we have on numerous occasions observed, however, prevailing defendants have never been entitled to the same treatment under the statute as prevailing plaintiffs. See, *e.g.,* *Vandenplas v. City of Muskego,* 797 F.2d 425, 428–429 (7th Cir. 1986); *Hershinow v. Bonamarte,* 772 F.2d 394, 395 (7th Cir.1985). A plaintiff may be deemed a prevailing party, and thus awarded attorney's fees, if he succeeds on "any significant issue in litigation which achieves some of the benefit [he] sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). In sharp contrast, a prevailing defendant may not recover attorney's fees from the plaintiff unless the district court finds that the plaintiff's action was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe,* 449 U.S. 5, 15, 101 S.Ct. 173, 178–179, 66 L.Ed.2d 163 (1980) (quoting *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978).[3] An award of attorney's fees to a prevailing defendant is not dependent upon a showing that the plaintiff commenced the action in bad faith, *Hughes,* 449 U.S. at 14, 101 S.Ct. at 178, although it will be more readily apparent that an action is frivolous if the plaintiff had no intention or hope of winning but rather brought suit solely to harass or op-

press the defendant. *Tarkowski v. County of Lake,* 775 F.2d 173, 176 (7th Cir.1985).

■ The reason behind this distinction between prevailing plaintiffs and prevailing defendants is largely self-evident. One of the principal concerns motivating Congress in enacting § 1988 was the generally acknowledged failure of the private market for legal services "to provide many victims of civil rights violations with effective access to the judicial process." *City of Riverside v. Rivera,* — U.S. —, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466. Because these victims were often too indigent to afford legal counsel and the expected monetary award in most civil rights cases was inadequate to induce lawyers to accept them on a contingent fee basis, Congress believed that fee awards to prevailing plaintiffs were essential to the vigorous enforcement of the civil rights laws. *Id.,* 106 S.Ct. at 2695–2696. If prevailing defendants were routinely awarded attorney's fees under § 1988, civil rights plaintiffs would be extremely reluctant to initiate litigation for fear of being charged with a fee award vastly exceeding the expected recovery, and in some cases their ability to pay, thereby vitiating the underlying purpose of § 1988. See *Vandenplas,* 797 F.2d at 429, 432; *Hershinow,* 772 F.2d at 395 (emphasizing the chilling effect large awards would have on plaintiffs); S.Rep. No. 94–1011, 94th Cong., 2d Sess. 5, reprinted in 1976 U.S.Code Cong. & Admin.News 5908, 5912 (civil rights plaintiffs should not be deterred "from bringing good faith actions to vindicate the fundamental rights here involved by the prospect of having to pay their opponent's counsel fees should they lose").

■ The *Hughes* standard was designed to strike a careful balance between the desire to encourage private litigants with valid claims to bring suit to vindicate civil rights and the need to deter frivolous

---

**3.** The *Christiansburg* case involved an action under Title VII. In *Hughes,* the Supreme Court adopted the *Christiansburg* standard wholesale for application in civil rights cases. Hence we refer to *Hughes* and *Christiansburg* interchange- ably as setting out the appropriate standard for determining whether a prevailing defendant may recover attorney's fees from the plaintiff under § 1988.

actions brought primarily to harass the defendant without hope of success. As a result, district courts may grant attorney's fees under § 1988 to prevailing defendants "only in very circumscribed situations." *Hershinow*, 772 F.2d at 395. The Supreme Court has cautioned against *post hoc* reasoning which equates the plaintiff's failure to prevail with the conclusion that his action must have been unreasonable or without foundation. *Christiansburg*, 434 U.S. at 421–422, 98 S.Ct. at 700–701. To avoid discouraging "all but the most airtight claims," the district court must evaluate whether the plaintiff's action was "frivolous, unreasonable, or without foundation" as of the time that the plaintiff filed suit, not with "hindsight logic" after judgment has been entered against him. *Id.* at 422, 98 S.Ct. at 700–701. "Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Id.* On the other hand, when a civil rights suit is lacking in any legal or factual basis, *Tarkowski*, 775 F.2d at 176, an award of fees to the defendant is clearly appropriate to deter frivolous filings and to ensure that the ability of the courts to remedy civil rights violations is not restricted by dockets crowded with baseless litigation. See *Hamilton v. Daley*, 777 F.2d 1207, 1212 (7th Cir.1985).

Because the award of attorney's fees under § 1988 is committed to the discretion of the district court, we review such awards under the "abuse of discretion" standard. *Vandenplas*, 797 F.2d at 429; *Hamilton*, 777 F.2d at 1212. We must consider whether the district court properly applied the *Hughes* standard and whether its findings are supported by the record.

■ As its first ground for finding that the plaintiffs' action against Tom Bechtel was unreasonable and without foundation, the district court stated that the plaintiffs produced no evidence to support their allegations that Tom personally coerced, threatened, or interfered with the plaintiffs' rights. Although the complaint is admittedly inartfully drafted, we do not construe it to assert a cause of action against Tom as being personally responsible for any of the alleged violations. The complaint does not allege that Tom changed his mind about selling his trailer to the plaintiffs because of their race, that Tom instructed either Fritz or Daniel to return the plaintiffs' purchase money, or that Tom was physically present at the campsite on April 21, 1985, and in any way harassed or intimidated the plaintiffs. Rather, the complaint identifies Fritz and Daniel Bechtel as the actors and states that they were at all times acting in the capacity of an agent for Tom. The plaintiffs' brief and other filings submitted in opposition to Tom's motion for summary judgment also make clear that the plaintiffs were seeking liability against Tom only under a theory of vicarious liability for the acts of Fritz and Daniel, and not under a theory of personal responsibility. Thus the district court erred in finding that the plaintiffs had produced no evidence to support allegations which they had never made.

■ As the second ground for finding that the plaintiffs' action against Tom was unreasonable and without foundation, the district court explained that there was no support for the position that Fritz was Tom's agent for purposes other than accepting the purchase money or the position that Daniel was Tom's agent at all. The district court's exclusive focus on the plaintiffs' failure to oppose Tom's summary judgment motion contravenes the Supreme Court's declaration in *Christiansburg* that a district court should not conclude that an action is unreasonable simply because it is ultimately unsuccessful. In accordance with the principles set out in *Christiansburg* and *Hughes*, this Court has held that a plaintiff's failure to adduce factual evidence to survive a motion for summary judgment or a motion to dismiss for failure to state a claim does not alone render the action frivolous justifying an award of fees to the defendant. *Vandenplas*, 797 F.2d at 432; *Hermes v. Hein*, 742 F.2d 350, 357 (7th Cir.1984); see also *Terry Properties, Inc. v. Standard Oil Co.*, 799 F.2d 1523,

1539 (11th Cir.1986). Instead, we have stressed that the district court must "discuss the specific information that formed the basis for the plaintiffs' suit, and ... explain why this information did not constitute adequate factual substance for the commencement of a nonfrivolous civil rights case." *Hermes,* 742 F.2d at 357; *Munson v. Friske,* 754 F.2d 683, 697 (7th Cir.1985). The district court's opinion supporting its order awarding attorney's fees to the defendant here makes no mention at all of the factual information on which the plaintiffs relied in filing their suit.

The relevant question for this Court is not whether the plaintiffs' claim against Tom Bechtel ultimately proved to be without merit, which it of course did, but whether, based upon the information available to the plaintiffs at the time they initiated their lawsuit, the claim was frivolous, groundless, or unreasonable. That question may not be reasonably answered in the affirmative. The central factual issue underlying the plaintiffs' vicarious liability claim against Tom was the scope and nature of the agency relationship between Tom and Fritz.[4] As a matter of well-settled agency law, a principal may be held liable for the discriminatory acts of his agent if such acts are within the scope of the agent's apparent authority, even if the principal neither authorized nor ratified the acts. In cases of racial discrimination in housing under both 42 U.S.C. § 1982 and the Fair Housing Act, 42 U.S.C. § 3604, the courts have imputed the wrongful acts of a real estate sales or rental agent to the property owner he is representing regardless of whether the owner specifically authorized the agent to engage in racial discrimination. See, *e.g., Hamilton v. Svatik,* 779 F.2d 383, 388 (7th Cir.1985); *Moore v. Townsend,* 525 F.2d 482, 485 (7th Cir.1975); *Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548, 552 (9th Cir.1980) (duty of property owner "to obey the laws relating to racial discrimination is nondelegable"). The principal owner's liability is unaffected by the fact that the person committing the discriminatory acts in the course of disposing of the property is a relative or a neighbor rather than a professional real estate agent. See *Hamilton,* 779 F.2d at 389 (brother acting as owner's agent); *Izard v. Arndt,* 483 F.Supp. 261, 263 (E.D.Wis.1980) (husband responsible for wife's discriminatory conduct in renting jointly owned house); *Wright v. Owen,* 468 F.Supp. 1115, 1118 (E.D.Mo.1979) (owner liable for discriminatory acts of neighbor even though neighbor was not the owner's designated rental agent).

Although the plaintiffs were not able to produce any factual evidence to counter the defendant's claim in his motion for summary judgment that the scope of Fritz's agency was limited to the sole tasks of receiving the plaintiffs' purchase money and providing them with a receipt, there is adequate information in the record to conclude that they had "an entirely reasonable ground for bringing suit," *Christiansburg,* 434 U.S. at 422, 98 S.Ct. at 701, and were entitled to engage in limited discovery to challenge the scope of the agency relationship between Tom and Fritz. The deposition testimony of Mr. Guman confirms that although he had no formal agreement with Tom to act as a sales agent regarding the trailer, he was authorized to show the trailer to interested parties, to provide them with Tom's name, address, and phone number, and to refer them to Fritz because he lived nearby. (Pl.App., Deposition of William Guman at 21). In fact, Mr. Guman indicated that he had shown Tom's trailer to three or four other couples prior to the April 21, 1985, transaction with the plaintiffs. (Pl.App., Deposition of William Guman at 20). Mr. Guman's statement that he referred people to Fritz suggests that Fritz might well have been acting as Tom's general sales agent in screening potential buyers. Furthermore, although Tom maintained that Fritz was authorized only to accept the plaintiffs' money and to write

---

**4.** As the district court pointed out in its opinion granting summary judgment in favor of Tom, the existence of any agency relationship between Tom and Daniel would depend upon first establishing the existence of an agency relationship between Tom and Fritz.

out a receipt, Fritz's own deposition testimony illustrates that he refused to give the plaintiffs a receipt unless they agreed to certain arrangements concerning the disposition of Tom's personal items which remained in the trailer. (Pl.App., Deposition of Fritz Bechtel at 12). This action would again suggest that the scope of Fritz's authority was broader than claimed.

■ Moreover, in light of the fact that Fritz was Tom's father as opposed to an unrelated person, the plaintiffs could have reasonably suspected that Fritz possessed the more general authority to reject those buyers whom he believed Tom would in some sense consider unsuitable, especially since Tom, who resided in Milwaukee, had never met the plaintiffs in person and was otherwise unable to oversee the transaction. Indeed, Fritz allegedly told Mrs. Guman that if Tom had known that the plaintiffs were black, he would never have agreed to sell his trailer to them. (Pl.App., Deposition of Joan Guman at 14). This statement further supports the plaintiffs' belief that Fritz did in fact possess the authority to rescind the sales contract and return the purchase money on account of the plaintiffs' race.[5]

This factual information proved inadequate to survive the motion for summary judgment. It was enough, however, to justify the plaintiffs' moving forward on their vicarious liability claim against Tom in an effort to uncover evidence that would lend support to their allegations.[6] See *Hermes,* 742 F.2d at 357. Defendants argue that the appropriate standard for determining whether a fee award is warranted is whether there was any admissible evidence to support the plaintiff's claim when he filed the complaint and thereafter. See *Soto v. Romero Barcelo,* 559 F.Supp. 739, 744 (D.P.R.1983). The Supreme Court expressly rejected such a test in *Christiansburg* when it recognized that factual uncertainty may exist at the outset of litigation and that decisive facts may not emerge until discovery or trial. 434 U.S. at 422, 98 S.Ct. at 700–701.

We also find the time framework through which this litigation proceeded significant. The plaintiffs filed their complaint on May 6, 1985. Tom's answer was filed on June 7, 1985. The plaintiffs engaged in discovery in July and August. Believing that this discovery had failed to uncover any factual evidence supporting the plaintiffs' claim against him, Tom filed his motion for summary judgment on September 16, 1985. The district court granted summary judgment in his favor on October 30, 1985. This sequence of events stands in sharp contrast to that in *Munson v. Friske,* 754 F.2d 683 (7th Cir.1985), where the plaintiff subjected the defendants to three years of discovery without producing any evidence to substantiate his claims, or *Hermes v. Hein,* 742 F.2d 350 (7th Cir.1984), where the plaintiffs prolonged their unsuccessful litigation over a three-year period. A prevailing defendant will always have been burdened as a result

---

5. Whether Fritz and Daniel returned the plaintiffs' money because they did not want a black couple living in Tom's trailer or whether the plaintiffs independently changed their minds about the trailer and requested the return of their money was a controverted issue of fact on which Fritz and Daniel ultimately prevailed at trial. However, in evaluating whether the plaintiffs had a reasonable ground for bringing suit, we focus not on how the material issues of fact were finally adjudged but instead on the factual information that formed the basis for the plaintiffs' suit. *Christiansburg,* 434 U.S. at 422, 98 S.Ct. at 700–701, *Hermes v. Hein,* 742 F.2d at 357–358. Therefore the plaintiffs' version of the facts is to be considered in determining whether their action was frivolous, unreasonable, or groundless for purposes of assessing fees under § 1988.

6. On October 24, 1985, the Wisconsin Equal Rights Division issued an initial determination of probable cause that the defendant, Tom Bechtel, had acted in violation of the Wisconsin Open Housing Law. The defendant objects that the plaintiffs could not have relied on that determination in initiating their action since it was not issued until after all of the summary judgment motions were submitted and completely briefed in the district court. Nevertheless, this type of confirmation lends some slight support to our finding that the plaintiffs' action was not frivolous, unreasonable, or groundless.

of the plaintiff's filing suit. That the defendant prevails, however, does not necessarily mean that the suit should never have been brought. We appreciate the hardships to which the defendant was subjected in defending this lawsuit, but under the factual circumstances here, we cannot say that they were unreasonable.

 Civil rights plaintiffs should nevertheless take heed that the Supreme Court has indicated that an award of attorney's fees to the prevailing defendant may be warranted if a plaintiff continues to litigate after it becomes clear that his action lacks factual substance. *Hughes*, 449 U.S. at 15, 101 S.Ct. at 178–179 (quoting *Christiansburg*, 434 U.S. at 422). In *Hermes v. Hein*, 742 F.2d at 358, this Court directed district judges to monitor the discovery process carefully and to note the lack of progress. If a plaintiff is unable to uncover any evidence to substantiate his claims after engaging in a reasonable amount of discovery, the trial court should alert the plaintiff "to the perilous course that [his suit] may be taking due to an increasingly apparent lack of support for [his claim]." *Id.* If the plaintiff insists on continuing the litigation in spite of such warnings, he does so at the peril of being assessed attorney's fees when the litigation is ultimately concluded. This kind of careful judicial oversight during discovery will encourage "the abandonment of claims that become hopeless" without discouraging "the nonfrivolous filing of civil rights suits." *Id.*

### III.

There is sufficient information in the record to conclude that the plaintiffs had a nonfrivolous basis for filing suit against the defendant. In the factual context presented here, the district court abused its discretion in finding that the plaintiffs' action was so unreasonable and groundless as to justify an award of attorney's fees to the defendant. Therefore the district court's order is reversed.