CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and Howard McDougall, trustee, Plaintiffs–Appellants,

v.

The KROGER CO., an Ohio corporation, Defendant–Appellee.

No. 95–1936.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1995.

Decided Jan. 10, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied March 1, 1996.

Albert M. Madden (argued), Robert A. Coco, Patrick J. Connor, Central States, Southeast & Southwest Area Pension Fund, Rosemont, IL, for Plaintiffs–Appellants.

Kirk D. Messmer, Jeffrey L. Madoff (argued), Beth E. Koch, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for Defendant–Appellee.

Before WOOD, Jr., COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Central States, Southeast and Southwest Areas Pension Fund ("the Fund" or "Central States") brought this action under § 515 of ERISA, 29 U.S.C. § 1145, against the Kroger Company ("Kroger"). The Fund claims that Kroger has not met its obligation to contribute to the Fund on behalf of certain Kroger employees. Kroger's obligation to make pension contributions is defined by the terms of the Collective Bargaining Agreement ("CBA") negotiated between Kroger and International Brotherhood of Teamsters Local 528. The district court examined the CBA and determined that, under its terms, Kroger was not obligated to make the pension contributions the Fund claimed were due. The district court, therefore, granted Kroger's motion for summary judgment. Central States appeals that judgment. For

the reasons set forth in the following opinion, we reverse the judgment of the district court, 1995 WL 135571, and remand the case for proceedings consistent with this opinion.

I

BACKGROUND

A. *Facts*

Kroger is a national grocery store chain. It operates a distribution and warehouse center in Atlanta. The warehouse employees and truck drivers who work at the Atlanta facility are represented by the Local 528 chapter of the International Brotherhood of Teamsters. Their employment relationship with Kroger is governed by a collective bargaining agreement. The CBA consists of two parts: first, a Master Agreement, which was negotiated by Kroger and the Teamsters and covers several facilities nationwide in addition to the Atlanta facility; second, a Local Supplement, which applies to the Atlanta facility alone.

The Master Agreement of the CBA describes, in addition to regular employees, two other types of employees: "probationary" and "casual." Probationary employees are defined as new employees who work on a trial basis for thirty to sixty days and may be discharged at the employer's discretion. After the trial period ends, however, probationary employees become regular employees and "shall be placed on the regular seniority list." CBA § 2.2. Casual employees, in contrast, are "hired on a short-term basis." CBA § 2.3. They are permitted only at locations with a past practice of hiring casuals, and the total number of casuals is limited to ten percent of the work force. Most importantly, the CBA provides that casuals do not receive fringe benefits or accrue seniority. CBA § 2.3. Under the terms of the Master Agreement, Kroger was obligated to make pension contributions on behalf of all employees who had worked for thirty days or more and who had been placed on the regular seniority list. CBA § 31.1. The effect of this provision is that Kroger is required to make contribution to the Fund on behalf of all probationary employees who had completed their trial period, but not on behalf of casual employees.

The Local Supplement uses different terminology to describe the workers—a situation which the district court described as creating "confusion." Instead of the distinction between regular, probationary, and casual employees found in the Master Agreement, the Local Supplement refers to "full-time" and "part-time" employees. Neither of these terms is defined. However, two characteristics of part-time employment emerge from the Local Supplement. Part-time employees are permitted a limited form of seniority: They may accrue seniority "only among other part-time employees." CBA II.D.2. They also must follow certain job-bidding procedures. When a permanent job becomes available, the most senior part-timer must bid on the position. Failure to bid or to bid successfully results in termination from Kroger.

Prior to 1977, all newly hired warehouse employees were designated as probationary. In 1977, Kroger changed that designation and classified all newly hired warehouse employees as casuals. Many of the employees hired as casuals remained with Kroger for a lengthy period of time and eventually became regular employees; once an employee became a regular employee and was placed on the regular seniority list, Kroger made pension contributions on behalf of the employee to Central States. However, as long as the employee was designated as a casual—often a period of several months [1]—no contribution was made.

In 1991, Central States audited the employment records at the Atlanta facility and concluded that those warehouse employees designated as casuals by Kroger were, despite their label, probationary employees. The Fund claimed that, for those warehouse employees (the "Atlanta employees"), Kroger should have made contribution after their thirtieth day of employment. Central States

---

1. Counsel for Kroger indicated to us at oral argument that he thought this period could range up to a maximum of six to eight months.

then brought this action against Kroger under 29 U.S.C. §§ 1132 and 1145, alleging that Kroger owed over $200,000 to the Fund for contributions that should have been made between December 28, 1986 and December 30, 1989. Both parties moved for summary judgment before the district court.

## B. *The Decision of the District Court*

The dispute before the district court was a straightforward one. Kroger took the position that it did not have to pay pension contributions on behalf of its Atlanta warehouse employees because they were casual employees. It equated the term "part-time" in the Local Supplement with the term "casual" in the Master Agreement. The district court therefore had to determine whether the Atlanta employees, termed casuals by Kroger, were in fact casuals, or were probationary employees who had been employed for more than thirty days and for whom pension contributions were required under the contract.

In its consideration of the parties' motions for summary judgment, the district court turned first to the Master Agreement. The court noted that the Agreement required Kroger to make contributions for regular employees, even part-time regular employees. The Agreement also made clear that only probationary employees, not casuals, could become regular employees at the end of their thirty-day probationary period. Although casual employees were to be hired on a "short-term basis," the Agreement did not specifically limit the duration of a casual employee's service.

In deciding the question before it, the court acknowledged at the outset that, in ordinary parlance, the terms "full-time" and "part-time" have a fixed meaning: Regular employees work the regular forty-hour work week; part-time employees work less. Nevertheless, the court determined that it ought not ascribe this usual meaning to the terms. Rather, the court determined that the term "part-time," as employed in the Local Supplement, unambiguously described the same employees as those described as casual in the Master Agreement.

The court acknowledged that, by interpreting the Local Supplement's use of part-time to mean casual, a conflict arose with the use of the term "part-time" in the Master Agreement. Although the court recognized that this conflict would create an ambiguity if the CBA were treated as one document, the court justified this conflict—part-time having two different meanings—on the ground that the CBA was a combination of two agreements and each agreement's use of the term was internally consistent. No ambiguity, therefore, resulted. Mem.Op. at 11, n. 4.

Because the district court found that those employees designated as casuals by Kroger were treated as true casual employees (as defined by the CBA), the court granted summary judgment on behalf of Kroger.

## II

## DISCUSSION

This matter comes before us following the district court's grant of summary judgment on behalf of Kroger. Given this procedural posture, we review the district court's decision de novo. We shall affirm the summary judgment in Kroger's favor only if there is no genuine issue of material fact and Kroger is entitled to judgment as a matter of law. *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 278 (7th Cir.1994).

We begin our review with the statutory basis of the Fund's claim. Central States asserts its claim against Kroger under § 515 of ERISA. That statute provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. In our previous examinations of this statute, we have emphasized the centrality of the collective bargaining agreement in a § 515 claim. It is the "collective bargaining and contribution agreements [which] establish the employer's obligation to the pension fund." *Central States, Southeast*

*& Southwest Areas Pension Fund v. McClelland, Inc.,* 23 F.3d 1256, 1258 (7th Cir.1994). Section 515 gives pension funds, such as Central States, the right to "enforce the writings according to their terms." *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1149 (7th Cir.1989) (en banc). A pension fund's reliance upon the terms of the CBA may not be thwarted by oral understandings between the employer and the union, *McClelland,* 23 F.3d at 1257–58, or by defenses that may defeat enforcement of the CBA between the employer and the union, *Gerber Truck,* 870 F.2d at 1153. We therefore focus initially on the CBA, the contract at the heart of the Fund's claim. When considering a contract in the context of an ERISA claim, federal common law rules of interpretation apply. *GCIU Employer Retirement Fund v. Chicago Tribune Co.,* 66 F.3d 862, 864 (7th Cir.1995) (citing *Phillips v. Lincoln Nat'l Life Ins.,* 978 F.2d 302, 307 (7th Cir.1992)).

■ We turn now to the CBA and consider first its structure. As we have already described at some length, the CBA is composed of two parts: a Master Agreement and a Local Supplement. In its review of the CBA, the district court recognized that, if the CBA were "simply one agreement," then there would be an ambiguity in the documentation because certain terms would have one meaning in the Master Agreement of the CBA and another meaning in the Local Supplement. This ambiguity did not result, in the view of the district court, because the CBA was really a combination of two agreements and the terms of one did not have to be harmonized with the terms of the other. When these agreements are viewed as distinct from each other, no ambiguity resulted; within each of the two parts, terms were used consistently.

We respectfully decline to accept the district court's conclusion with respect to the relationship between the two parts of the CBA. Rather than two agreements, the Master Agreement and the Local Supplement form a single, unitary contract; they must be read in this manner. This approach is necessary for two reasons. First, the Union and Kroger clearly set forth their intent that the Local Supplement be incorporated into the Master Agreement and be made a part of it. Article Thirty–Two of the Master Agreement, titled "Local Agreements and Practices," specifically states that:

> All oral understandings, agreements and/or past practices claimed to exist at the time of the execution of the Agreement by the Local Union involved shall be reduced to writing, signed by the parties hereto and *made a part of this Agreement* within six (6) months of said execution date or they will be deemed not to exist. . . .

CBA art. 32 (emphasis added). Clearly, this provision establishes that Kroger and the Union intended that the Local Supplement be incorporated into the Master Agreement. The distinction relied upon by the district court—that the CBA is two agreements, not one—is not supported by the plain text of the CBA. As we discussed above, it is the plain text of the CBA upon which the Fund is entitled to rely.

Second, even if the CBA did not include an incorporation clause directing how the Local Supplement was to be considered in relation to the Master Agreement, we see no reason why we should depart from the basic rule that related documents must be read together. *See Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 565 (7th Cir.1995).[2] The situation before us is quite similar to that in *Murphy;* the Master Agreement and the Local Supplement were executed at the same

---

**2.** In *Murphy,* we rejected plaintiffs' contention that the CBA governing their working relationship with their employer should be read separately from their employee welfare benefits plan. Both the CBA and the benefits plan were negotiated by the same parties (the plaintiffs' union and their employer), they were executed at the same time, they were both supported by the same consideration, and the CBA expressly incorporated the plan by reference. *Id.* at 567 (citing *Lippo v. Mobil Oil Corp.,* 776 F.2d 706, 713 n. 13 (7th Cir.1985)). In *Lippo,* we determined that, although a franchise agreement was evidenced by five separate documents, because "they were executed at the same time between the same parties, for the same purpose and as parts of a single transaction," they were to be "read together and construed as a single contract." *Id.* at 713 n. 13. (As in *Lippo,* the Master Agreement and the Local Supplement were executed at the same time by the same parties.)

time by the same parties. Indeed, according to counsel's representation to us at oral argument, the Local Supplement was physically attached to the Master Agreement at the time the document was executed. The CBA as a whole contains only one signature block—following the Master Agreement and preceding the Local Supplement. Furthermore, as we already have noted, the Master Agreement expressly incorporates the Local Supplement by reference. Every indication surrounding the execution of the CBA points to the conclusion that the Union and Kroger intended the Master Agreement and the Local Supplement to comprise one agreement, and any consideration of the CBA must begin with the recognition that it is one contract we are examining—not two.

■ Reading the entire CBA—the Master Agreement and the Local Supplement—as a totality, we turn to the language of the CBA itself and consider first whether it is ambiguous. Whether the CBA is ambiguous is a question of law that we review de novo. *Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir.1994). The CBA is ambiguous if it is susceptible to more than one reasonable interpretation. *Brewer v. Protexall, Inc.*, 50 F.3d 453, 458 (7th Cir.1995). If the CBA is unambiguous, this court may declare its meaning as a matter of law. If it is unclear, then questions of interpretation must be resolved by the trier of fact. *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999 (7th Cir.1993), *aff'd* —— U.S. ——, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995).

■ Neither the Fund nor Central States argues before this court that the CBA is ambiguous; they agree that it is unambiguous, but disagree as to its interpretation. When parties suggest different, yet reasonable interpretations of a contract, the contract is ambiguous. *Murphy*, 61 F.3d at 565; *see also Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 586 (1st Cir. 1993) ("Because the parties attribute reasonable but differing meanings to the term 'vested,' we find that the term is ambiguous . . . .").

■ When we examine the CBA as a single agreement, we conclude that the term "part-time"—a term central to the issue in this case—is susceptible to more than one reasonable meaning, thus rendering the CBA ambiguous. Part-time could mean casual or it could refer to a regular employee who works a shorter week. The first of these possible interpretations—that part-time is indeed another label for casual employment—finds some support in the CBA. For example, within the Local Supplement, there is a provision concerning "Hours, Overtime and Guarantees" for warehouse employees. Paragraph six of that provision states that "within a particular week, the number of part-time warehouse employees shall not exceed ten percent of the total number of warehouse employees." CBA II.A.6. In the Master Agreement, under the definition of casual employee, the number of casual employees is also capped at ten percent of the work force. CBA § 2.3. It is not unreasonable, after viewing these two provisions together, to equate casual employees with part-time employees and to limit such employees to ten percent.

However, other considerations of the CBA support a contrary conclusion—that the term "part-time" does not refer to casual employment but simply has its customary meaning. According to the customary and usual meaning of the term, a part-time employee refers to an employee who works less than a regular work week; such employees are identifiable by the number of hours worked over a certain period. Additionally, several significant provisions of the Master Agreement suggest strongly that part-time ought not be equated with casual. First, casual employees, as defined in the Master Agreement, clearly are not entitled to receive fringe benefits or to accrue seniority, and no pension contributions are due on their behalf. However, the Master Agreement also appears to require contributions on behalf of regular part-time employees. Specifically, section 31.4 of the Master Agreement (under the heading "Pensions") states that "[c]ontributions to the Pension Fund must be made for each week on each regular or extra employee, *even though such employee may work only part-time under the provisions of this*

*contract....*" CBA § 31.4 (emphasis added). This provision appears to indicate that a regular employee who works a shorter week is a part-time employee and *is* eligible for pension payments. Here, part-time cannot possibly refer to a casual employee; casuals are not entitled to pension contributions.[3]

We therefore conclude that the CBA is ambiguous. Because of that ambiguity, the district court should not have treated the CBA as unambiguous and should not have declared its meaning as a matter of law on summary judgment. Rather, the matter must be returned to the finder of fact for a determination of the meaning of part-time.

As we emphasized at the beginning of our discussion, the Fund is entitled to rely on the terms of the documents that define eligibility for benefits. Its right to contributions may not be thwarted by unilateral actions of the employer which contravene the terms of the collective bargaining agreement. *See McClelland,* 23 F.3d at 1258 ("No matter what an employer and local union agree orally, the collective bargaining and contribution agreements establish the employer's obligation to the pension fund...."); *Gerber Truck,* 870 F.2d at 1149 ("The pension or welfare fund is like a holder in due course in commercial law, or like the receiver of a failed bank....") (citations omitted). In this case, it is only if the employees at issue are truly casual, and not probationary, as those terms were understood by the parties to the CBA, that Kroger's reclassification of the Atlanta employees (and thus its failure to make contributions on their behalf) is permissible.

## CONCLUSION

We therefore reverse the judgment of the district court and remand this matter to the district court for consideration consistent with this opinion.

REVERSED AND REMANDED.

---

3. Another section poses an ambiguity, at least at first glance. Section 2.3 of the Master Agreement provides that "[c]asual employees shall not ... accrue seniority." Part II.D.2 of the Local Supplement, in contrast, provides that "[p]art-time employees ... will be considered to have seniority only among other part-time employees." If, as the district court concluded, part-timers are casuals, then these two provisions may conflict: Casuals may not accrue seniority, and yet part-timers may.