183 F.3d 623 (7th Cir. 1999)
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, HOWARD MCDOUGALL and CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, Plaintiffs-Appellees,
v.
TRANSPORT, INCORPORATED, a Minnesota Corporation, Defendant-Appellant.
 No. 98-1644
 United States Court of Appeals, Seventh Circuit
 Argued November 13, 1998
Decided July 1, 1999
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 96 C 2067--David H. Coar, Judge.
 Before CUMMINGS,[1] ROVNER and DIANE P. WOOD, Circuit Judges.
 ILANA DIAMOND ROVNER, Circuit Judge.
 
 
 1
 Central States, Southeast and Southwest Areas Pension Fund, Central States, Southeast and Southwest Areas Health and Welfare Fund and the Funds' trustee Howard McDougall (for simplicity's sake, we will refer to the plaintiffs collectively as "the Funds") sued Transport, Inc. for past due contributions, interest, liquidated damages, attorney's fees, audit costs and costs under 29 U.S.C. sec. 1132(g)(2). The district court granted the Funds' motion for summary judgment, and Transport appeals. We affirm.
 
 I.
 
 2
 The material facts are undisputed. The district court set the facts out in full in its opinion at 991 F. Supp. 1003 (N.D. Ill. 1998), and we will repeat here only the facts relevant to the appeal. The Funds are employee benefit plans and trusts. Employers wishing to participate contribute to the Plans under the terms of Collective Bargaining Agreements ("CBAs") that local unions negotiate on behalf of employees. The contributions are used to provide benefits to the participants of the Plans, and to cover administrative costs. In setting the contribution rates, the Funds use actuarial estimates. The actuaries calculate the contribution rate assuming that each employer will pay equal contributions for all employees within the same job classification. The actuaries also assume that some participants for whom employers have made contributions will never receive any pension benefits or will have less expensive health and welfare benefits than other participants. In fact, the parties agree that contributions paid for these less costly participants are necessary to support the level of benefits provided to other employees. Without contributions for all employees, including those less likely to receive full benefits, the actuarial assumptions would be unsound, and the Funds might lack sufficient assets to pay the promised benefits. For that reason, the Funds will not accept CBAs which permit employers to contribute to the Funds for some but not all employees within a particular class (for example, for some, but not all, truck drivers).
 
 
 3
 Transport is an employer that entered into CBAs with Local Union No. 116 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"). During the relevant time period, Transport and the Union entered into two CBAs, one covering 1988 through 1992 (the 1988-92 Rider), and the other covering 1992 through 1995 (the 1992-95 Rider). The parties agree that the Funds did not receive a complete copy of the 1992-95 Rider, and that discrepancy is the source of this dispute. In 1992, Transport and the Union also entered into a Participation Agreement. The 1992-95 Rider obliged Transport to make contributions to the Funds for "each regular or extra employee," and specified that Transport "shall contribute" to the Funds a particular sum "for each employee covered by this agreement who has been on the payroll thirty (30) days or more." Under the Participation Agreement, Transport and the Union agreed to be bound by all of the rules and regulations of the Funds pursuant to certain Trust Agreements.
 
 
 4
 Transport was obliged under these Trust Agreements to forward to the Funds any CBAs it entered into with the Union. The Trust Agreements spelled out the consequences of a failure to submit a CBA:
 
 
 5
 Any agreement or understanding between the parties that in any way alters or affects the Employer's contribution obligation as set forth in the collective bargaining agreement shall be submitted promptly to the Fund in the same manner as the collective bargaining agreement; any such agreement that has not been disclosed to the Fund as required by this paragraph shall not be binding on the Trustees and shall not affect the terms of the collective bargaining agreement which alone shall be enforceable.
 
 
 6
 See Pension Fund Trust Agreement, Appendix of Appellees at 75; Health and Welfare Trust Agreement, Appendix of Appellees at 122. The Participation Agreement similarly requires that if the employer enters into a new CBA or modifies existing CBAs, the employer must notify the Funds of the changes. See Participation Agreement, Appendix of Appellees at 265, para. 5(c).
 
 
 7
 The Funds reviewed each CBA and modifications to the CBAs to insure that they complied with the participation rules established by the Funds. For example, the Funds examined the CBAs to insure that a particular CBA did not allow an employer to pay differing contributions for employees in the same job classification. If the Funds detected a violation of their rules in reviewing a CBA, they notified the Funds' Trustee, who in turn determined whether the employer would be allowed to continue to participate in the Funds. The Funds reviewed the 1992-95 Rider submitted by the Union, and found no violations. However, the 1992-95 Rider submitted to the Funds was not the whole agreement between Transport and the Union. As the Funds later determined, Transport and the Union had also entered into an "Extra Drivers Agreement," which was never forwarded to the Funds for review as required by the Participation Agreement.
 
 
 8
 The Extra Drivers Agreement specified that employees hired after a particular date would be enrolled in company-sponsored heath, welfare and 401k plans. Under this agreement, Transport made no contributions to the Funds for these employees, even though it was obliged to do so under the CBAs that had been forwarded to the Funds for review. In 1996, the Funds received the Extra Drivers Agreement for the first time, and instituted an audit of Transport's contributions and employee records. The Funds determined that Transport failed to report accurate employee work histories to the Funds and failed to make contributions owed on the employees described in the 1992-95 Rider. The audit, which itself cost the Funds $6,095 to conduct, revealed that Transport owed $37,316.60 to the Pension Fund and $50,332.00 to the Health and Welfare Fund. The Funds notified Transport that exclusion of new hires was not allowed by the Funds' rules, and that any such provision should be deleted from the next contract, a demand with which Transport complied. The Funds then brought an action to recover the contributions Transport should have been making on these new employees, and to recover the costs of the audit, attorneys' fees and liquidated damages.
 
 II.
 
 9
 The district court noted that this case was "a slight twist" on a common argument offered by employers seeking to evade liability for failure to make contributions to pension, health and welfare funds. Normally, the employers would enter into CBAs with unions using language that would pass muster with the funds' participation rules. But then, to save money, the employer would make an oral side agreement with the union that the employer would contribute to the funds for older or higher risk employees but would contribute less or nothing for low risk employees. The funds, in turn, determine the contribution level assuming the employer will contribute for all employees in a particular job class, as they agreed in the CBAs they submitted to the funds. If the funds were aware of the employer's side agreement, they would never allow that employer to participate because weeding out low risk employees invalidates the funds' actuarial assumptions, and puts the funds at risk of falling short on assets used to pay benefits. When the funds discover that the employer is failing to pay for all employees in a job class, the funds are forced to conduct a costly audit and then sue to recover the unpaid contributions. The district court noted that this Court has uniformly rejected the employers' various defenses to this scheme, and required the employers to pay past due contributions and audit costs. The only twist in this case was that Transport's side agreement was written, not oral.
 
 
 10
 Transport argued that the agreement was a single, integrated document, not a contract with a "side agreement," and therefore this situation was distinguishable from the precedent cited by the district court. Transport argued that it was the Union that failed to forward the whole document to the Funds, and that Transport did not have any intent to deceive the Funds. The district court held that Transport's intent was irrelevant, and that liability was instead premised on a number of policy considerations, and that these policy considerations applied with equal force to oral or written side agreements. The district court granted summary judgment in favor of the Funds and ordered Transport to pay all delinquent contributions, plus the greater of either double interest or single interest plus liquidated damages, plus attorneys' fees, audit expenses and costs incurred by the Funds in connection with the suit. Transport appeals.
 
 III.
 
 11
 Transport claims three main errors with the district court's analysis. First, Transport contends that the Funds' rules cannot be reasonably read to require Transport to make contributions for drivers who were expressly excluded from participation in a written provision of the 1992-95 Rider. This argument is premised on the assumption that Transport entered into a single, integrated CBA rather than a primary agreement and a side agreement.[2] Second, Transport maintains that requiring payment for contributions for these excluded drivers is not an appropriate remedy for breach of the requirement that Transport forward any and all CBAs and documents modifying the CBAs to the Funds. Third, Transport charges that a reasonable trier of fact could find that Transport's omission of the Extra Drivers Agreement was innocent, and that the omission was caused solely by the Union, which removed that part of the agreement before forwarding the document to the Funds.
 
 
 12
 All of these arguments are answered by our precedent. The first and third arguments raised by Transport are somewhat related, because both assume that if Transport can demonstrate that it entered into a single, integrated agreement, and that the Union was solely responsible for the omission of the problematic language from the document that was ultimately forwarded to the Funds, then Transport cannot be held liable for contributions for the new hire drivers who were expressly excluded from participation in the Funds by the CBA. We can dispense with these arguments easily, because we will assume for the purposes of our analysis that Transport entered into a single, integrated agreement and never intended to mislead the Funds as to the nature of that agreement. Under the clear precedent of this Court, neither of those facts is relevant to our analysis. Transport's concession that the document received by the Funds did not contain the Extra Drivers Agreement is determinative. The Extra Drivers Agreement is that portion of the CBA that revealed that Transport did not intend to make contributions for newly hired drivers. The Extra Drivers Agreement is thus a side agreement in the sense that only Transport and the Union knew of its existence. We add that although Transport did not intend to deceive the Funds, it did delegate to the Union its duty to forward the CBA to the Funds. Applying well- settled agency principles, Transport is liable for the acts of its agent, the Union. Coates v. Bechtel, 811 F.2d 1045, 1051 (7th Cir. 1987); Restatement of the Law of Agency 2d at sec. 144.
 
 
 13
 We held en banc in Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148 (7th Cir. 1989), that Section 515 of ERISA requires employers to comply with the terms of their agreements to make contributions to funds such as these. 870 F.2d at 1153. Employers may not assert traditional contract defenses, "such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law." Id. Despite any defects in the formation of the contract, we held that the employer must still keep its promise to the pension plans. Id. We grounded our rule in several policy considerations, some of which were revealed in congressional hearings on Section 515. Among the considerations Congress expressed was the high cost of collecting delinquent contributions, including the cost of litigation concerning claims and defenses unrelated to the employer's promise to pay. In order to remedy this problem, Section 515 makes employer's promises enforceable "to the extent not inconsistent with law." Id. Anything less, we reasoned, could saddle plans with unfunded obligations, because the plans are obliged to cover the employees under the terms of the participation agreements regardless of whether the employers make appropriate contributions. Id. See also Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co., 69 F.3d 1312, 1314 (7th Cir. 1995), cert. denied, 517 U.S. 1134 (1996) ("Gerber Truck Service precludes the use of extrinsic evidence that was unknown to a pension or welfare fund. . . . [A] multi-employer pension agreement is not a normal two-party contract for which evidence of idiosyncratic meaning may be used to depart from the objective meaning of the words."); Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc., 23 F.3d 1256, 1257- 58 (7th Cir. 1994) (under Gerber, "[n]o matter what an employer and local union agree orally, the collective bargaining and contribution agreements establish the employer's obligation to the pension fund, which is not party to local understandings and limitations. . . . [A]s a matter of law the [local] understanding is irrelevant.")
 
 
 14
 None of these considerations are limited in application to oral, as opposed to written, side agreements. The effect on the Funds was the same. Transport claimed that its contract with the Union was different from the contract the Union submitted to the Funds for review. Regardless of who was at fault for the fact that the Funds did not receive the entire agreement, the Funds then faced the prospect of lengthy litigation (which in fact occurred) about the true nature of the agreement, and faced the prospect of having to pay benefits to workers for whom no contributions had been made by the employer.
 
 
 15
 Nor is it relevant that it was the Union that chose not to forward the full agreement to the Funds. Transport was contractually obliged to forward the agreement to the Funds and delegated that duty to the Union. Transport is now bound by the acts of its agent. See Coates, 811 F.2d at 1051; Restatement of the Law of Agency 2d at sec. 144. Its agent, for whatever reason, did not forward the Extra Drivers Agreement part of the CBA to the Funds for review. This was a breach by the union, and we noted in Gerber that a breach by the union would not relieve an employer of its duty to make pension contributions. 870 F.2d at 1152 (citing Lewis v. Benedict Coal Corp., 361 U.S. 459, 469-71 (1960)). The Funds are now entitled to enforce the contract that they received, which they believed was the whole agreement between the Union and Transport. To hold otherwise could subject the Funds to paying unfunded obligations, and to enduring lengthy litigation about the true meaning of contracts between employers and unions. Gerber requires a different result, and we affirm the district court's grant of summary judgment in favor of the Funds.[3]
 
 
 16
 The only remaining issue is the appropriate remedy, and again, we believe that Gerber controls. Transport argues that payment of contributions on the employees covered by the Extra Drivers Agreement is not a remedy that covers the reasonably predictable costs of breach of the notice requirement. However, under Gerber, and under the statute, the appropriate remedy is the delinquent contributions, interest, attorneys fees, and amount equal to the greater of interest (again) or liquidated damages. Gerber, 879 F.2d at 1156; 29 U.S.C. sec. 1132(g)(2). The judgment of the district court is, accordingly,
 
 
 17
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Judge Cummings participated in the consideration of this case but died before the decision was rendered.
 
 
 [2]
 Transport considers the Extra Drivers Agreement together with the 1992-95 Rider to be a single, integrated CBA.
 
 
 [3]
 Transport cites Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co., 73 F.3d 727 (7th Cir. 1996), in support of its argument that we must enforce the agreement as written, including the Extra Drivers Agreement. Kroger, however, is distinguishable because both the main and the side agreements there were disclosed to the Funds. Nothing in Kroger weakens our stand in Gerber that undisclosed agreements are not binding on the Funds, and that the Funds may enforce the CBA as disclosed.