In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2257, 99-3014

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,
and HOWARD MCDOUGALL,

Plaintiffs-Appellees,

v.

KROGER COMPANY,

Defendant-Appellant.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 93 C 3669--John F. Grady, Judge.


Argued February 17, 2000--Decided September 15, 2000




   Before HARLINGTON WOOD, JR., COFFEY and RIPPLE, Circuit
Judges.

   RIPPLE, Circuit Judge.  Central States, Southeast
and Southwest Areas Pension Fund (the "Fund")
brought this action under sec. 515 of ERISA, 29
U.S.C. sec. 1145, against the Kroger Co.
("Kroger") to recover delinquent pension
contributions for certain employees at Kroger's
warehouse center in Atlanta, Georgia. Kroger's
obligation to make these contributions is defined
by a Collective Bargaining Agreement ("CBA")
negotiated by Kroger and the union representing
the Atlanta employees.

   This is a successive appeal; familiarity with
our first opinion is assumed. See Central States,
Southeast & Southwest Areas Pension Fund v.
Kroger Co., 73 F.3d 727 (7th Cir. 1996) ("Kroger
I"). In that opinion, we held that the meaning of
"part-time," as used in the CBA, was ambiguous.
We explained that "part-time" could refer either
to regular employees who worked a shorter week or
to "casual" employees. See id. at 732. Because of
this ambiguity we remanded the case to the
district court for a determination of the meaning
of part-time. See id. at 733.

   After additional discovery and a bench trial,

the district court resolved the ambiguous meaning of "part-time" in favor of the Fund by holding that "part-time" employees were "regular employees," not casual employees, and that the Fund, therefore, was entitled to the disputed contributions. The district court entered a judgment in favor of the Fund on liability and later supplemented its judgment with an award of attorneys' fees and costs to the Fund. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I
BACKGROUND
A.

Kroger is a national grocery store chain with operations in several states, including Georgia. The warehouse employees and truck drivers at Kroger's warehouse center in Atlanta are represented by the Local 528 chapter of the International Brotherhood of Teamsters (the "Union"). Since 1967, the employment relationship between Kroger and its employees at this facility has been governed by a CBA negotiated by Kroger and the Union. Kroger's participation in the Fund began in 1971, and the CBA has defined Kroger's obligation to make pension contributions to the Fund on behalf of the Atlanta employees. The CBA between Kroger and the Union, although one document, consists of two parts. The first part, the Master Agreement, was negotiated by Kroger and the Union and covers the Atlanta facility as well as several other Kroger facilities nationwide. The second part of the CBA, the Local Supplement, applies only to the Atlanta facility. As we explained in our previous opinion, both the Master Agreement and the Local Supplement form "a single, unitary contract" and, consequently, must be read together. Kroger I, 73 F.3d at 731.

The Master Agreement defines who is a regular employee and also differentiates between two other types of employees--"probationary" and "casual." Probationary employees are defined as "new" employees who work on a trial basis for 30 to 60 days and who may be discharged at Kroger's discretion. CBA sec. 2.2. They become regular employees at the end of their trial period and, according to the Master Agreement, "shall be placed on the regular seniority list." CBA sec. 2.2. On the other hand, "casual" employees are defined as employees "hired on a short term basis." CBA sec. 2.3. The Master Agreement states that casual employees "may be employed from time to time" for those facilities with a past practice of hiring casuals. It contains no specific limit on the duration of a casual employee's service. The number of casual employees is limited to 10 percent of the work

force. See CBA sec. 2.3. The CBA provides that casual employees "shall not receive fringe benefits or accrue seniority." CBA sec. 2.3.

Under the CBA, Kroger is obligated to make pension contributions for each employee who has been employed for 30 days or more and who is on the "regular seniority list." CBA sec. 31.1. As we explained in our previous opinion, "[t]he effect of this provision is that Kroger is required to make contribution to the Fund on behalf of all probationary employees who had completed their trial period, but not on behalf of casual employees." Kroger I, 73 F.3d at 729. Furthermore, the Master Agreement states that Kroger must make contributions to the Fund for "each regular or extra employee, even though such employee may work only part-time." CBA sec. 31.4 (emphasis added). No contribution is required for employees "who work either temporarily or in cases of emergency." CBA sec. 31.4.

Unlike the Master Agreement, the Local Supplement does not differentiate between "probationary" and "casual" employees. Instead, the Local Supplement refers to "part-time" and "full-time" employees, but it defines neither of these terms. The Local Supplement also refers to part-time employees as "part-timers." A few characteristics of part-time employment nevertheless emerge from the Local Supplement. First, the Local Supplement caps the number of "part-time" employees at 10 percent of the warehouse employees. See CBA II.A.6. Also, part-time employees are permitted a limited form of seniority: They may accrue seniority "only among other part time employees." CBA II.D.2. Finally, part-time employees must follow certain job-bidding procedures to obtain regular positions.

The job-bidding process for part-time employees first became part of the Local Supplement in 1985. Under the procedure established in 1985, when a permanent job became available, the most senior part-timer was required to bid on the position. See CBA II.D.1. Failure to bid or to bid successfully would result in termination from Kroger. The bidding procedure was modified in 1988 so that part-timers were given an opportunity to bid for a second regular position if they failed to obtain a position on their first bid. See CBA II.D.1 (1988). Starting in 1985 and continuing through the 1988 change, the bidding procedure set forth in the Local Supplement specified that a part-timer who had obtained a bid position was required to work in that position for a "trial period" of 21 days. CBA II.D.1. If the employee's performance proved to be unsatisfactory during this trial period, the Local Supplement allowed Kroger to return the

employee to his former part-time position.

Prior to 1977, all newly hired employees at Kroger's Atlanta facility were designated as probationary. In 1977, however, Kroger began classifying all new employees at the Atlanta facility as casuals. These employees were not guaranteed fixed hours or schedules. Kroger would place the new hires on a separate seniority list, but those employees on the list did not have any seniority status over regular employees. Rather, the list was used to allow these employees, who commonly were referred to as "part-timers" at the Atlanta facility, to bid (in order of date of hire) for regular jobs as those jobs became available. Many of the employees hired as casuals remained with Kroger for a lengthy period of time and eventually became regular employees through the bidding process. Once a part-timer became a regular employee and was placed on the regular seniority list, Kroger made pension contributions on behalf of that employee to the Fund. As long as the employee was designated as a casual, however, no contribution was made.

B.

In 1991, the Fund conducted an audit of the employment records at Kroger's Atlanta facility and concluded that, between December 28, 1986, and December 30, 1989, Kroger had failed to make pension contributions required under the CBA for certain warehouse employees. The Fund therefore brought this action against Kroger under sec. 515 of ERISA; it alleged that Kroger owed the Fund over $200,000 in delinquent contributions.

In our previous opinion, we reversed the district court's grant of summary judgment in favor of Kroger. The district court had determined that the CBA was unambiguous and had declared its meaning as a matter of law. On appeal, we examined the CBA as a whole and concluded that the term "part-time," as it was used in the CBA, was susceptible to more than one reasonable meaning. "Part-time," we explained, could mean "casual" or it could refer to "a regular employee who works a shorter week." Kroger I, 73 F.3d at 732. Because the term "part-time" had more than one reasonable interpretation, we held the CBA to be ambiguous. Consequently, the meaning of the CBA could not be determined as a matter of law, and we remanded the case "for a determination of the meaning of part-time." Id. at 733.

C.
1.

On remand, the district court allowed additional discovery and then conducted a bench trial. At

the conclusion of the trial, the district court announced from the bench the four findings of fact that would form the basis of its final decision. Those findings of fact were:

First, the employees in question were not "hired on a short-term basis," nor were they "employed from time to time," as defined in article 2.3 of the master portion of the [CBA].

My second finding of fact is based upon the first one. It is that the phrase "part-time" in the local portion of the agreement is not the same as and does not mean "casual" as defined in article 2.3 of the master portion of the agreement.

My third finding of fact is that the local union representatives and the negotiators acquiesced in the treatment of all new hires as "part-timers" not entitled to pension and welfare contributions from at least 1977 through the end of the audit period and beyond. These employees were told by management that they would not be [en]titled to benefit contributions until they had successfully bid for regular employment and had been placed on the regular seniority list. The employees fully understood that.

My fourth finding of fact is that the term "part-time" in the local portion of the agreement was interpreted by the company and the local union representatives as referring to these employees who had not been placed on the regular seniority list and who, by reason of that fact, would not be eligible for benefit contributions, regardless of the length of time they had been employed by the company.

Tr.8-B at 1005-06.

The district court also elaborated on these findings. The court observed that the employees could not have been hired on a "short-term basis" because "the employees in question were hired by Kroger with the hope and the expectation that they would become, each of them, full-time regular employees when an opening occurred." Id. at 1003-04. Although Kroger may have known that there was nothing inevitable about its employees becoming full-time regular employees, the court explained, Kroger's "hope was that the training that would be given to these employees would be utilized by the employees to complete their probationary period successfully and to equip themselves to become full-time employees when the opportunity arose." Id. at 1004. Moreover, the court noted, the employees in question could not have been "employed from time to time," according to the court, because that phrase referred to "people who come and go, people whose employment

is interrupted, people who might be absent for long periods of time," and did not refer to people "who are on hand continuously to work part-time as needed." Id. at 1005. In the district court's view, the evidence showed that the employees in question were available, and were considered to be available by Kroger, "on a continuous basis to work part-time as needed during the peaks and valleys" of Kroger's Atlanta operation. Id. "These employees," continued the court, "were just as continuous as the peaks and valleys were." Id. The district court further explained that the content of the employee handbooks Kroger had provided to its new hires, as well as the manner in which the employees had been trained and nurtured, demonstrated that the employees in question "were by no means regarded as people who were likely to be on hand for only a short period of time." Id. at 1004. To the contrary, the court explained, "it was expected that in the normal course, [these employees] would work for a long period of time, both as what was referred to as part-timers, and then eventually as people who achieved regular employment and got on the regular seniority list." Id.

2.

The district court later issued a written decision memorializing its findings of fact and addressing the issue of liability. The district court explained that the starting point for its analysis was to consider "whether the evidence show[ed] the Atlanta warehouse employees in question were treated as 'casual' by the company and the union as that term is used in the [CBA]." R.197 at 2. According to the district court, the efforts of the parties to prove that the term "part-time" in the Local Supplement either was or was not synonymous with "casual" had proved to be "largely unpersuasive." Id. In the district court's view, "[t]he union and company witnesses [had] attempted reenactments that are contrary to the way they acted at the time." Id. at 3./1 Moreover, the district court concluded, "[t]he fact is that the local union and company representatives acted according to their own lights, with little or no regard to whether their mutual understanding of whom would be paid fringe benefits comported with the terms of the master agreement." Id. at 2. Indeed, the court found that "[i]f the matter had been left to the local union representatives, no question of contributions for these employees would ever have arisen." Id. at 2-3.

In the end, the court concluded, its third and fourth findings of fact manifested "'local' understandings" that "cannot prevail against the

definition of 'probationary' employees" contained in the Master Agreement. Id. at 5. Because the employees were not casual, the district court held that they necessarily were probationary. The employees in question, the district court concluded, were "regular employees who worked a shorter week," or, in any event, were not "casual" employees as defined by the Master Agreement. Id. at 5-6. Thus, because the employees were probationary, the court held that Kroger was required to make contributions to the Fund for the employees in question.

Based on its holding that Kroger should have made pension contributions for the employees in question, the district court awarded damages to the Fund totaling $446,946.07. The district court also awarded attorneys' fees, costs, and double interest to the Fund as provided by 29 U.S.C. sec. 1132(g)(2). According to the district court, Kroger did not contest the amount of attorneys' fees and costs, so the court awarded the amount requested by the Fund.

II
DISCUSSION
A.

We review de novo a district court's interpretation of a contract. See Moriarty v. Svec, 164 F.3d 323, 330 (7th Cir. 1998). When a contract is unambiguous, the court may declare its meaning as a matter of law. See Kroger I, 73 F.3d at 732. But when a contract is ambiguous, questions of interpretation are to be resolved by the trier of fact. See id.; Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan, 3 F.3d 994, 999 (7th Cir. 1993). We review de novo a district court's determination of the meaning of an ambiguous contract term, see WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc., 25 F.3d 422, 428 (7th Cir. 1994); LaSalle Nat'l Bank v. Service Merchandise Co., 827 F.2d 74, 78 (7th Cir. 1987), as well as the court's factual findings following a bench trial, see Fed. R. Civ. P. 52(a); Brunswick Leasing Corp. v. Wisconsin Central, Ltd., 136 F.3d 521, 525 (7th Cir. 1998).

Thus, in this case Kroger has the "difficult, though not insurmountable" burden of showing that the district court's factual findings are clearly erroneous. Brunswick, 136 F.3d at 526. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). "Where there are two permissible views of the evidence, the

factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985). If the district court's account of the facts is plausible in light of the record viewed in its entirety, we may not reverse that decision even if we may have decided the case differently. See id. at 573-74 (noting that if there are two possible understandings of the evidence, the factfinder's conclusion cannot be clearly erroneous); Salus v. GTE Directories Serv. Corp., 104 F.3d 131, 135-36 (7th Cir. 1997) (applying these principles in an ERISA case). Furthermore, any reasonable doubts we may harbor should be resolved in favor of the district court's ruling "in light of its greater immersion in the case." Cook v. City of Chicago, 192 F.3d 693, 697 (7th Cir. 1999).

B.
1.

   The statutory basis for the Fund's claim against Kroger is sec. 515 of ERISA, which provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. sec. 1145. This section entitles pension funds to enforce the terms of agreements when those terms are unambiguous. See Central States, Southeast & Southwest Areas Pension Fund v. Hartlage Truck Serv., Inc., 991 F.2d 1357, 1361 (7th Cir. 1993); see also Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1149 (7th Cir. 1989) (en banc) (stating that sec. 515 allows pension funds to "enforce the writings according to their terms"). Because pension funds are entitled to rely on the terms of a CBA, a fund's reliance upon those terms "may not be thwarted by oral understandings between the employer and the union," Kroger I, 73 F.3d at 731 (citing Central States, Southeast & Southwest Areas Pension Fund v. Joe McClelland, Inc., 23 F.3d 1256, 1257-58 (7th Cir. 1994)), or by written side agreements between the employer and the union that have not been disclosed to the fund, see Central States, Southeast & Southwest Areas Pension Fund v. Transport, Inc., 183 F.3d 623, 628 (7th Cir. 1999), or "by defenses that may defeat enforcement of the CBA between the employer and the union," Kroger I, 73 F.3d at 731 (citing Gerber Truck, 870 F.2d at 1153).

   Federal common law rules of contract

interpretation apply when we consider a contract in the context of an ERISA claim. See Kroger I, 73 F.3d at 731. The written word will prevail over the subjective understandings of the contracting parties unless the written agreement is truly ambiguous. See Pabst Brewing Co. v. Corrao, 161 F.3d 434, 442 (7th Cir. 1998); Gerber Truck, 870 F.2d at 1151-53. In our case, we have determined that the term part-time is ambiguous. When a court is interpreting an ambiguous term, the task of the court is to determine what "the contracting parties . . . intended the clause to mean." In re Teamsters Indus. Employees Welfare Fund, 989 F.2d 132, 136 (3d Cir. 1993). To determine what the contracting parties intended, the court may look at extrinsic evidence to determine the meaning the contracting parties attached to the ambiguous term. See Moriarty, 164 F.3d at 331 (citing FDIC v. W.R. Grace & Co., 877 F.2d 614, 620-21 (7th Cir. 1989)); see also Rosetto v. Pabst Brewing Co., 217 F.3d 539, 543 (7th Cir. 2000) (stating that, when an ambiguity "is apparent just from reading the contract," "evidence is admissible to cure" that ambiguity).

2.

During the bench trial, Kroger and the Fund presented the district court with the testimony of over 20 witnesses and with over 300 exhibits in their efforts to demonstrate that the parties to the CBA intended "part-time" to be either synonymous or not synonymous with "casual." Much of the evidence presented was conflicting. On appeal, Kroger and the Fund have devoted the majority of their arguments to the question of whether the district court correctly resolved the ambiguous meaning of "part-time" as that term was used in the CBA. We shall begin our analysis, however, by examining one of the unambiguous terms of the CBA--the term "casual employee."

Section 2.3 of the Master Agreement states that casual employees, who are hired on a "short term basis," may be "employed from time to time" at Kroger facilities with a history of hiring such employees. CBA sec. 2.3. The parties do not claim that the meaning of "casual," as it is used here, is ambiguous; nor have they questioned the meanings of "short-term basis" or "from time to time." Relying on the definition of a casual employee in sec. 2.3 of the CBA, the district court explained that it understood that term to refer to those employees that Kroger intended, when it hired them, to work for a short period of time. Casual employees, the court reasoned, would not be employees Kroger expected "in the normal course" to work "for a long period of time." Tr.8-B at 1004. The court also explained that

casual employees would be people "who come and go, people whose employment is interrupted, people who might be absent for long periods of time," rather than people "who are on hand continuously to work part-time as needed." Id. at 1005. We agree with the district court's assessment of the meaning of "casual employee."/2

The CBA's definition of "casual employees" is binding on Kroger. See Joe McClelland, 23 F.3d at 1257-58; Gerber Truck, 870 F.2d at 1149. Thus, in our previous decision in this case, we observed that "it is only if the employees at issue are truly casual, and not probationary, as those terms were understood by the parties to the CBA, that Kroger's reclassification of the Atlanta employees (and thus its failure to make contributions on their behalf) is permissible." Kroger I, 73 F.3d at 733. In applying the CBA's definition of "casual employee" to the facts of this case, the district court found in its first finding of fact that the employees in question were not casuals. Specifically, the district court found that these employees were not hired on a short-term basis because they were hired "with the hope and the expectation that they would become, each of them, full-time regular employees when an opening occurred." Tr.8-B at 1003-04. Indeed, the court found, Kroger expected these employees, regardless of whether they stayed with Kroger, to "work for a long period of time, both as what was referred to as part-timers, and then eventually as people who achieved regular employment and got on the regular seniority list." Id. at 1004. Furthermore, the district court found that the employees in question were not employed "from time to time" because they were, in fact, "as continuous as the peaks and valleys" of Kroger's operation. Id. at 1005.

Kroger submits that the district court ignored the evidence of record and the parties' intent by concluding that the new hires were not "casuals." Instead, Kroger asserts, the new hires were hired on a "short-term basis" and were employed "from time to time," thus meeting the definition of "casuals" given in the Master Agreement. Kroger further submits that the employees in question must have been casuals because their employment was marked by characteristics of "casual" employment. They were not given set schedules; they had no weekly salary guarantees; and they served as fill-ins for Kroger's regular employees. After the new employees worked their first 30 days at Kroger, their status did not change, and most of the new hires never became regular employees. In fact, Kroger submits, 85 percent of them worked less than 12 weeks. Additionally, Kroger explains, until the

employees obtained a bid position, they were not entitled to job benefits like progressive discipline, jury duty, and holidays--all benefits regular employees enjoyed. Therefore, Kroger submits, the new hires were "effectively" casual employees. Appellant's Br. at 25. Finally, Kroger takes issue with the district court's conclusion that Kroger expected every new hire to become a regular employee. This could not possibly be the case, Kroger submits, because it knew that only a small fraction would stay with the company more than a few weeks.

There is sufficient evidence in the record, however, to support the district court's conclusion that these employees were not "hired on a short term basis" or "employed from time to time." Thus, we cannot say that the district court's first finding of fact is clear error. The district court stated, in particular, that the employee handbooks and Kroger's "training and nurture" of its new hires persuaded the court that the employees in question were not casuals. Tr.8-B at 1004. As an example, one of the employee handbooks used by Kroger welcomed them to the "Kroger team" and instructed them to use the handbook "as a training tool and guide during your first several weeks at Kroger." R.209, Ex.92 at 971. The district court also found that, regardless of whether the employees stayed with Kroger for a long time, Kroger hired these employees with the intention that they would remain with the company and eventually become "regular" employees. Even though Kroger had a high turnover rate at the Atlanta facility, there was also evidence that eventually a new hire that stayed with the company either had to bid for a permanent position or, failing that, was fired. Here, we agree with the Fund that "[t]he ability to bid on permanent jobs is entirely at odds with the concept of casual employment which by contract definition, is short and indefinite," Appellee's Br. at 18, especially because there was evidence that it took six to nine months to get to the top of the "part-time" seniority list.

3.

Kroger nevertheless argues that the district court clearly erred because the court failed to resolve--or worse, incorrectly resolved--the ambiguity in the meaning of the term "part-time" as used in the CBA. According to Kroger, had the district court resolved the ambiguity correctly, it would have concluded, based on the record, that "the parties intended ['part-time'] to have a temporal meaning only in the Master Agreement, but to denote a status of employee, 'part-timers,' the employees at issue, in the Local Supplement." Appellant's Br. at 16. Furthermore,

Kroger submits, the district court's third and fourth findings of fact warranted judgment for Kroger because those findings of fact evidenced the understanding of the parties to the CBA that "part-time," as used in the Local Supplement, referred to casual employees, who were not entitled to pension contributions. The district court's ruling, Kroger maintains, runs contrary to the meaning of "part-time" that Kroger and the Union, the parties to the CBA, intended when they contracted and have accepted since at least 1977.

Kroger correctly points out that, in general, the practical interpretation the parties to a contract have given that contract is strong evidence of their intended meaning for an ambiguous term./3 Nonetheless, regardless of the terminology employed with respect to the "part-time" employees in Atlanta, Kroger and the Union simply could not have redefined "casual" in derogation of the clear meaning of that term provided in the CBA. Just as employers may not rely on oral or written side agreements when those agreements contravene the terms of the governing agreement, see Transport, 183 F.3d at 628; Joe McClelland, 23 F.3d at 1257-58, Kroger may not rely on a practice--even one accepted by the Union--that contravenes the express and unambiguous terms of the CBA. Whatever meaning Kroger and the Union may have ascribed to "part-time" in the Local Supplement, Kroger's practice of treating the employees in question as "casuals" for pension contribution purposes when, in fact, those employees were not hired on a short-term basis or employed from time to time cannot thwart the unambiguous definition of casual employees contained in the CBA.

The district court acknowledged that its task on remand was a difficult one given the fact that the CBA, "as interpreted by the local representatives of the union and by the company, is marked by an inconsistent view of casual and part-time as between the two portions of the agreement." Tr.8-B at 1007. Nevertheless, because the employees were not truly casuals, they had to have been probationary employees, the only other type of new employee countenanced by the CBA. And because they were probationary employees, and not casuals, Kroger should have made the disputed pension contributions for them.

C.

Kroger also submits that the Fund should be estopped from claiming that pension contributions are owed for the Atlanta workers. According to Kroger, it can establish the elements of estoppel because it reasonably relied, to its detriment,

on a knowing misrepresentation because the Fund did not object to Kroger's practice of deeming all new hires as casuals.

Kroger argues that the Fund made knowing misrepresentations to it in two ways. First, Kroger claims, the Fund knowingly misrepresented to it that the Fund did not object to the company's practice. According to Kroger, each month it sent the Fund a report that showed the gap between the employees' original hire dates and the dates Kroger began making contributions for them. The Fund then sent Kroger a monthly bill for fund contributions based on the information provided by Kroger the previous month. By "misrepresenting to Kroger that Kroger's payment and reporting was acceptable," Kroger argues, it was misled into thinking that no pension contributions were required. Appellant's Br. at 42. Secondly, Kroger argues that, by accepting Kroger's monthly contributions, the Fund knowingly misrepresented to Kroger that the Fund had read and had approved the CBA. Had the Fund read the CBA, according to Kroger, the Fund would have known that the CBA was ambiguous (as it did when it finally conducted its audit) and would have asked Kroger about the ambiguity.

Moreover, Kroger submits that it reasonably relied on the Fund's misrepresentations. Essentially, Kroger explains, the Fund's inaction "lulled Kroger into a false sense of security regarding its use of part-timers and its contribution obligations." Appellant's Br. at 44. Finally, Kroger maintains that it relied to its detriment on the Fund's misrepresentations. According to Kroger, had it not relied on the misrepresentations, Kroger would not have incurred the expense and exposure caused by the present litigation.

The district court held that our decision in Coker v. Trans World Airlines, Inc., 165 F.3d 579 (7th Cir. 1999), precluded relief on an estoppel theory in this case because, under Coker, estoppel requires a "knowing misrepresentation." R.197 at 4 (citing Coker, 165 F.3d at 585-86). According to the district court, the Fund had not made a knowing misrepresentation because such a misrepresentation requires an intent to mislead. In this case, the district court explained, "nothing like that occurred." Id.

This circuit has not decided whether estoppel claims should be available in ERISA actions involving multi-employer, funded plans. See, e.g., Shields v. Local 705, Int'l Bhd. of Teamsters Pension Plan, 188 F.3d 895, 899-900 (7th Cir. 1999) (declining to decide whether

estoppel could ever apply to such a plan). Even assuming that estoppel could be available in this context, however, we agree with the district court that Kroger cannot make out the elements of estoppel, although we reach this conclusion for reasons different from the district court. Kroger's estoppel argument is foreclosed because Kroger's reliance on any misrepresentation made by the Fund could not have been reasonable. "Reliance on the misrepresentation is reasonable only if the party asserting estoppel does not or should not know the truth." Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1027 (4th Cir. 1997). Here, Kroger, the party asserting estoppel, obviously knew of its practice of designating the employees in question as casuals and, therefore, it was in a better position than the Fund to know the truth that its practice did not comport with the CBA. Thus, we cannot accept Kroger's estoppel argument.

D.

  Finally, we must address the question of attorneys' fees and costs. The district court correctly awarded the Fund its attorneys' fees and costs for its efforts in the district court to enforce the contribution agreement with Kroger. See 29 U.S.C. sec. 1132(g)(2). Likewise, the Fund is entitled under sec. 1132(g)(2) to recover its reasonable attorneys' fees and costs in this appeal. See, e.g., Central States, Southeast & Southwest Areas Pension Fund v. Wintz, 155 F.3d 868, 876 (7th Cir. 1998); Joe McClelland, 23 F.3d at 1259.

Conclusion

  For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

/1 As an example, the district court noted that one of Kroger's witnesses had testified that the employees at the Atlanta facility were commonly referred to as "part-time casual." R.197 at 3. This testimony, in the district court's estimation, was not credible; according to the court, the employees "would have been described as 'part-time,' or 'casual,' but not both." Id.

/2 We note that the district court's understanding of the term "casual employee" is not only consistent with the terms of the CBA, it also comports with the dictionary definition of

"casual employment." Black's Law Dictionary defines "casual employment" as:

Employment at uncertain or irregular times. Employment for short time and limited and temporary purpose. Occasional, irregular or incidental employment. Such employee does not normally receive seniority rights nor does he normally receive fringe benefits.

Black's Law Dictionary 198 (5th ed. 1979); see also Central States, Southeast & Southwest Areas Pension Fund v. Independent Fruit & Produce Co., 919 F.2d 1343, 1350 (8th Cir. 1990) (citing Black's Law Dictionary to define "casual employment" in a CBA lacking its own definition of the term).

/3 See Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); Moriarty, 164 F.3d at 332 (stating that extrinsic evidence of the parties' understanding of an ambiguous term is "highly relevant"); In re Teamsters, 989 F.2d at 137 (stating that evidence of a course of conduct over a substantial period of time is "particularly compelling" on the question of the parties' intent).